CHARLES J. MILLER, APPELLEE, V. CENTRAL TAXI COMPANY, APPELLANT.

FILED MAY 15, 1923.    No. 22359.

1. **Evidence.** Ordinarily a question involving the rate of speed of a motor-propelled vehicle is not a question for expert testimony. *Oakes v. Omaha & C. B. Street R. Co.*, 104 Neb. 788.

2. **Trial: WITNESSES: CROSS-EXAMINATION.** Where a plaintiff in a personal injury action seeks by appropriate interrogatories on the cross-examination to discover whether the defendant is indemnified from loss by an insurance company, it is error for the court to sustain an objection to interrogatories which tend to develop the fact on that question.

3. **Appeal: REMITTITUR.** Where plaintiff in a personal injury action recovers a verdict and the trial court directs a remittitur and the defendant appeals, this court will on request of plaintiff, in a proper case, set aside such remittitur either in whole or in part as the evidence may warrant.

4. **Trial.** It is elementary that the jury and not the court is the trier of questions of fact.

5. **Damages.** Evidence examined, and *held* that the required remittitur

Miller v. Central Taxi Co.

is excessive, and all over $2;000 thereof is ordered vacated under authority of section 9154, Comp. St. 1922.

APPEAL from the district court for Douglas county: LEE S. ESTELLE, JUDGE. *Affirmed as modified.*

*Brome & Ramsey* and *J. P. Uvick,* for appellant.

*John M. Berger, George A. Keyser* and *James C. Kinsler, contra.*

Heard before MORRISSEY, C. J., LETTON, DEAN and DAY, JJ.

DEAN, J.

This action was brought to recover for personal injuries sustained by plaintiff, as alleged, in a collision between plaintiff's car, which he was driving, and one of defendant's taxicabs driven by an employee of defendant in a negligent and wrongful manner and at an excessive and careless rate of speed. Plaintiff recovered a verdict for $9,250 for personal injuries and $350 for his damaged car, or a total of $9,600. At the trial the late Judge Lee S. Estelle presided. Subsequent to Judge Estelle's death his Honor Judge Charles A. Goss overruled defendant's motion for a new trial on condition that a remittitur be filed in the sum of $4,250. Plaintiff, in compliance with the order, filed the remittitur and judgment was rendered in the sum of $5,350, from which defendant has appealed.

Immediately before the accident plaintiff was employed by the Burlington railroad as a locomotive fireman on a switch engine and had been so engaged about seven years. He was then earning from $125 to $150 a month. At the time he was a strong and able-bodied man 42 years of age. The accident happened on the Eleventh street viaduct at Omaha, February 21, 1919, about 11:30 at night. Plaintiff was driving south in a Ford automobile. His wife was seated at his side in the front seat and two of his married sisters and a baby occupied the rear seat. The party was returning from a social visit with friends. Defendant's taxicab was driven by

a man named Sullivan, an employee of defendant. He had three passengers, two women and one man, and was driving from the south. The collision occurred not far from the south end of the viaduct, which is about two blocks in length.

When the taxicab was about a block away, plaintiff testified that he first saw its approaching lights; that it came upon the viaduct in a "zigzag" manner and at a speed of from 40 to 45 miles an hour; that the speed of his car at no time exceeded 10 or 12 miles an hour; that when the taxicab struck his car he had driven close up to the west or righthand side of the viaduct and was about 6 inches from the sidewalk, and was just bringing his car to a stop when the impact occurred. In the matter of the position and the speed of the respective cars his evidence was corroborated by Mrs. Tams who was an occupant of the car.

To show the force of the impact, it may be added that the evidence tends to prove that the right front wheel was broken off, the axle and fender were broken, the frame of the car was bent and the top was broken down. It was made worthless for practical purposes, but was valued at from $80 to $100. It also appears that the taxicab continued on its course about 15 or 20 feet after the collision, ran over the opposite sidewalk and then turned over on its side. Its occupants were not seriously if at all injured. Plaintiff testified that when he got out of the car the driver of the taxicab was leaning up against the banister of the viaduct and that he was drunk. On the cross-examination he testified that the driver's conversation and manner indicated drunkenness and that he had the smell of intoxicating liquor on his breath.

In respect of his injuries plaintiff testified that the top of his head was severely bruised and cut and his neck was injured and that a throat trouble was induced; that a piece of broken glass from the windshield went through his cheek and that he had other cuts on his face which were less severe; his hand was injured and

became swollen and in a week or so the swelling began
to disappear and he discovered that a bone in his hand
was broken; that as a result of the injuries to his head he
had almost daily headaches and dizzy spells and at
times would stagger and almost fall, and that he could
not stoop to shovel coal into the locomotive firebox for
any considerable length of time.  He testified that he
returned to his work as fireman on a switch engine about
10 days or two weeks after the accident; that he worked
a few days and on account of headaches and dizziness
and the injury to his hand he was laid off; that he
continued to work intermittently at his occupation one-
half or two-thirds of the time for from three to five
months; that while he was so occupied the engineer
changed work with him and let him run the engine,
while working in the railroad yards, while he, the en-
gineer, did the firing, and that but for the engineer's as-
sistance he could not have continued in his work. Plain-
tiff further testified that he suffered much pain from
his injuries and that he was at times prostrated by
nervous attacks; that his sleep was broken and he was
unable to rest, and that at the end of four or five months,
on account of his injuries, he was compelled to dis-
continue work on the engine.  Subsequently he obtained
temporary employment with a brother-in-law where his
work was light and his earnings were about $4 a day.
It also appears that for a time thereafter he again
worked for the railroad company and wheeled sand to a
drying device; that for a part of the time he shoveled
the sand and at other times it was shoveled by others.
When asked to explain how he could at all shovel coal
into the firebox of a locomotive or shovel sand, he
testified that when using a shovel he was left-handed and
that the left hand consequently bore the load, and that
with the thumb and the forepart of his right hand he
could manipulate the outer end of the shovel.  After he
left the Burlington he took a contract to run a coal
chute which was operated by a gasoline engine, but he

had to have a man to start the engine and he could then operate it. The contention is that the injuries to his head and neck and right hand are permanent, and that from the injuries generally he suffered a nervous shock which has resulted, as the doctors testified, in traumatic neurasthenia.

Plaintiff's evidence in regard to changing work with the engineer, and his assistance in firing the engine, and his evidence with respect to the manner of using the shovel while firing was corroborated by the engineer. He testified that a locomotive fireman has to be left-handed because he must stand near the left-hand side of the engine when shoveling coal into the firebox. The engineer also testified that after the accident plaintiff frequently complained of headaches and dizziness, but that he made no such complaint before he was injured.

Three or four physicians testified at great length with respect to plaintiff's injuries. One made an examination about 15 months after the accident and this was only a few days before the trial. He testified that one of the incisions on plaintiff's cheek extended clear through to the inside, but that aside from the scars left on his face no other bad result should be anticipated; that he found a scar about three-fourths of an inch long on top of plaintiff's head which was due to a cut or a blow; that there were indications of a scar on his right hand, and on examination he found a diminished strength of grip which would doubtless be permanent; that plaintiff had some disorder in the muscles and ligaments in the right side of the neck, and that they were tender to the touch and responded to pressure, and these disorders had a marked tendency toward a permanent condition; that plaintiff was very nervous, restless and uneasy; that he did not have control of himself and was without normal poise and rest; that the tenderness of the tendons in the neck was due to irritation of the nerve which supplied that part of the body; that the dizziness of which plaintiff complained was probably due to the brain substance

having been injured from concussion, and that there might be a continued hemorrhage of brain tissue resulting from laceration. His expressed opinion was that plaintiff's then condition probably resulted from the injuries that he found on his head and neck, and that the general physical state and the depressed condition would naturally result from such injuries as plaintiff appeared to have sustained. With respect to the continuation of pain in the future the doctor testified: "The probability is that the symptoms will continue, varying perhaps in character, or may diminish some." He further testified that the results of head injury are very numerous and very indeterminate and almost any form of nervous disorder may result from a blow on the head.

Another physician corroborated the material evidence of the physician whose evidence has just been reviewed. In addition thereto he went somewhat into detail and testified that in plaintiff's right arm he found that the reflexes were wholly retarded from the shoulder down, and that he discovered a displacement of the right index finger or knuckle and a callous condition on the wrist which indicated either a fracture or a displacement of the small bones; that he believed the injury to the hand was permanent, and that the affection of the neck was the result of nerve injury which would gradually increase; that with respect to dizziness he put the plaintiff through certain movements which did not seem to induce unbalancing, but when the patient looked down or backward he lost his balance and staggered slightly. He further testified that plaintiff's condition "expresses itself in a tremor of the arms, and also his legs shaky in some degree."

A physician called by the court was interrogated with respect to the injuries generally and the consequent nervous shock which was the outgrowth of the accident. He testified: "There has been probably some impairment, but I think it is largely of mental origin. Q. Of mental origin? A. Yes, sir. Q. And being of mental origin,

to what would you attribute it, conceding the man to have been perfectly normal prior to his receiving the injury or shock which was occasioned by a collision between two automobiles, one going at the rate of 40 miles an hour, and the impact being of such a character that the large taxicar was thrown a distance of 10 or 15 feet? Would you not say that that would contribute to it; that could be easily a contributing factor to the psychological condition? A. Yes. Q. And the shock or the effect connected with the injury which you have discovered on this man's head, notwithstanding the fact that it had been practically healed, would produce what you have just called 'traumatic neurasthenia?' That is correct? A. Yes, sir; it might produce what he complained of largely, traumatic neurasthenia, usually produces a traumatic neurasthenia; yes." The doctor further testified: "'Trauma' means—is a blank term; the derivation of the term means nerve weakness; and it is dependent, or the fact is that it is largely dependent, on the mental state of the individual. Q. But it is a weakening of the nerve, of course; that is true? A. Weakening of the nervous energy; yes; lessening of the nervous energy."

Defendant complains because Mrs. Tams was permitted to testify that the oncoming taxicab was traveling at the rate of 40 miles an hour. Her evidence merely corroborated that of plaintiff on this point and there was no evidence to the contrary. Ordinarily a question involving the rate of speed of a motor-propelled vehicle is not a question for expert testimony. *Oakes v. Omaha & C. B. Street R. Co.*, 104 Neb. 788. Judge Cooley observed that the speed of a passing train involves no question of science and is not a question for experts, and added: "Any man possessing a knowledge of time and of distances would be competent to express an opinion upon the subject." *Detroit & M. R. Co. v. Van Steinburg*, 17 Mich. 99.

Counsel complains of misconduct on the part of plaintiff in that he offered to show that Mr. Borsky, the

president of the defendant company, went to the viaduct soon after the accident to make some surface measurements, and that he took with him an attorney for an insurance company to assist him who was not an attorney employed by him in the present case. The offer was denied. The argument is that plaintiff sought by this means to convey to the jury the intelligence that the company was indemnified against loss by an insurance company. Complaint is also made in that an apparent attempt was made to convey the same intelligence to the jury in the cross-examination of Mr. Borsky. The witness was not permitted to answer. We think the court erred in its ruling.

The question is not new in this state. We held in a like case that, if the defendant was not resisting plaintiff's demand in its own behalf, but that some insurance company was defending, under the cover of defendant's name, plaintiff had a right to make that fact known to the jury. *Egner v. Curtis, Towle & Paine Co.,* 96 Neb. 18.

Plaintiff maintains that the remittitur is excessive. Under section 9154, Comp. St. 1922, this court, in a proper case, is empowered to reduce the amount of the required remittitur in whole or in part. The act provides: "That whenever the court shall direct a remittitur in any action, and the same is made, and the party for whose benefit it is made shall appeal said action, then the party remitting shall not be barred from maintaining that said remittitur should not have been required either in whole or in part."

It may be observed that the remittitur was not required by the judge who presided at the trial, but by a judge who did not see the witnesses nor have an opportunity to weigh the spoken word of evidence as it was pronounced in open court. We think there is merit in plaintiff's contention that the amount required to be remitted was excessive. From a review of the evidence we are unable to find that the verdict as returned by the jury, the trier of questions of fact, should have been re-

duced almost in half by the court's order. We think that under all the cirucumstances a deduction of $2,000 would be more nearly in keeping with the facts as disclosed by the evidence. It may here be added, parenthetically, that this class of litigation is well known to be a grievous burden to litigants.

That the collision was the proximate cause of plaintiff's injuries and of the resulting nervous shock is plainly apparent. The fact that the physical injuries are permanent and that the resultant mental ailment is of a progressive type and that its evil effects will increase with the passing years is established by competent evidence of men who are learned in the medical profession. On this question two of the doctors are in perfect accord.

At the time of the accident plaintiff, then a man of 42, was in life's prime. He had never known a day's illness and for about seven years had worked continuously at the laborious occupation of a locomotive fireman. So far as the record shows his daily task was without intermission. He now approaches middle age with a body maimed and a mind clouded as a direct result of the gross negligence of the defendant company. As plaintiff's ailment progresses from stage to stage his earning capacity will more than correspondingly decrease. Before he has reached the end of man's allotted span of life for active, productive labor he may himself become a dependent while yet there remains under his roof those who are dependent upon his daily labor for their daily bread.

It is ordered that the remittitur in excess of $2,000 be vacated and a judgment entered for plaintiff for $7,600 as of the date of the rendition of the judgment in the district court. As herein modified the judgment is affirmed.

AFFIRMED AS MODIFIED.