JOSEPH MANGIAMELI, APPELLEE, V. ANTHONY ARIANO, APPELLANT.

FILED APRIL 10, 1934. NO. 28835.

*Kennedy, Holland & DeLacy,* for appellant.

*Reed, Ramacciotti & Robinson,* contra.

Heard before ROSE and PAINE, JJ., and CARTER, LIGHTNER and THOMSEN, District Judges.

PAINE, J.

This is a suit for $51,993.70 for damages for alleged malpractice of defendant, a dentist, in extraction and treatment of a tooth. The jury returned a verdict for $15,000. As a condition to overruling the motion for a new trial, the district judge required the plaintiff to file a remittitur of $7,500, and thereupon entered judgment for the remaining $7,500, to which plaintiff filed a cross-appeal.

The bill of exceptions consists of 499 pages, including the testimony of some 9 doctors and medical experts, and the discussion, pro and con, of the defendant's 40 assignments of error required briefs of 549 pages.

The plaintiff in his petition alleged that he was a minor, acting by and through his mother and next friend; that the defendant was a duly licensed and practicing dentist and dental surgeon; that upon September 18, 1930, the plaintiff was suffering pain in his lower right mandible, near his first lower right molar, and, with his older sister, went to consult the defendant. That he was suffering from pain, abscess, or inflammation, and had a rapid pulse, and fever. That said defendant did not correctly diagnose the ailment, nor treat it in a proper manner. That the tooth was extracted in such a manner as to tear the gum and distort the adjoining teeth. That he failed to disinfect the wound. That the next day the right jaw began to swell up, and plaintiff made frequent visits to the defendant for treatment of the jaw, at which times for several weeks he would probe and stir up the infected area by lancing the socket. Plaintiff became exceedingly sick, and the jaw swelled to enormous size, causing extreme pain, and he could not open his mouth. That the defendant should have but failed to diagnose the ailment as osteomyelitis of the jaw, and that the treatment given was hazardous, improper, and grossly dangerous. That until October 21, 1930, the defendant continued to treat plaintiff improperly, misinformed the plaintiff, and thus by deceit prevented him from obtaining

proper treatment. The petition then sets out in detail the serious condition that he was in when he finally went to a competent physician and surgeon.

The petition has attached to it an assignment of bills, showing that the physician and surgeon's bills amounted to $1,504, the hospital and X-ray bills to $339.70, and for special nurse, $150, making total bills of $1,993.70.

The defendant in his answer admitted that he pulled plaintiff's tooth for $1; denied that he used undue force, or tore or distorted the teeth or tissues, and denied that he was guilty of any negligence whatever. The defendant insists that the plaintiff was entitled to nothing, and that the court should have directed a verdict in his favor.

The plaintiff enters a cross-appeal from the act of the trial judge in directing him to file a remittitur of $7,500.

The evidence sharply differs, and the arguments were highly controversial on all of the important points. The plaintiff was an 11-year-old boy at the time his tooth was pulled. The defendant, Dr. Ariano, was 33 years of age, graduated from Creighton dental school in 1924, took up other work in Colorado for a couple of years, but since 1926 has been practicing dentistry at 1620 South Tenth street, Omaha. His cash-book was introduced as exhibit 23, and covers his cash receipts from June, 1930, until September, 1931, and during the month of September, 1930, being the month in which the charge was laid, he had a very active business, took in several hundred dollars, and entered items on his cash-book for all except four days of that month, entering on at least one day nearly $80. He appears to have been a very busy dentist, from the record of his cash-book. In this cash-book there is an entry of September 29, "Mangiameli, Joe, $1." This item is entered out of its regular order, and changes have been made in the dates of several other items near this one, and similar changes have not been pointed out on any other page in the book. The plaintiff, on the other hand, contends that, instead of pulling this tooth on September 29, it was pulled on September 18,

and that the defendant made this entry on September 29 to show that he had the plaintiff under his care and treatment for 11 days less time before he went into the hospital. The defendant saw the boy for the first time when he was brought in by his sister in the afternoon of the day the tooth was extracted; he had pain and toothache, and pointed at a lower deciduous molar, being a baby tooth, and defendant sent the boy and his older sister home and told them to get their parents' consent. Their testimony is that he sent them home to get $1 and come back later. He testifies that, when they came back later, he used an injection of novocaine, using an Erbe needle, which he passed through a flame; that there was no swelling in the glands of the neck at the time; that they told him the boy had been kept awake with the toothache for a couple of nights; that he used an instrument, known as an elevator, to separate the gum from the tooth, and then extracted it. The next day there was a swollen area, and he told them to put on an ice-bag, and he thinks he gave the boy a sedative, and irrigated it with a salt solution, and opened a puffed-up place in the socket with a lance. That he lanced it again the second time the boy came, and that at the fourth visit of the boy the swelling had moved back towards the ear, and there was intense pain, and he called in Dr. Distefano, who divided the office with him, and was a doctor of medicine, to see it several times.

The boy was in extreme pain, and vomited in the doctor's office at the time of the extraction. The evidence discloses that he finally came into the hands of Dr. Carnazzo, who was a skilled surgeon, and had had experience in his practice with more than 200 cases of osteomyelitis, more than 25 being of the jaw. Dr. Carnazzo was called to the home between 2:00 and 2:30 on October 21. He diagnosed the condition as acute osteomyelitis and cellulitis of the neck, with an additional diagnosis of Ludwig's angina, which is a complication which follows any infection on the floor of the mouth. It is shown by redness, a tenderness, and a hard, boardlike rigidity, which

gives the patient the appearance like a bull's neck. At that time the parts were swollen to two or three times normal size, extending from the temple towards the right eye, closing that eye, and extending down into the tissues of the neck, covering all of the right side of the head. The jaws were locked, and he could not get the mouth open at all. He was taken to the St. Joseph's Hospital, an X-ray was taken, and Dr. Kelly, the X-ray expert, reported that the right mandible showed marked irregularity in bony structure, and looked like an osteomyelitis. The bone was honeycombed. Dr. Carnazzo stated that he decided that he must incise and drain the Ludwig's angina first, for the quicker it is drained the sooner the patient will get well, and that the percentage of mortality in Ludwig's angina, such as patient had, is very high, as about 90 per cent. of the patients die, while the mortality from acute osteomyelitis was only from 5 to 10 per cent. He described in detail the four operations, indicating upon the boy in front of the jury.

The plaintiff was in the hospital the first time from October 21 to November 20, and was very sick during a portion of that time; his life being despaired of at times. The first operation took one hour and 15 minutes, and consisted of an incision clear across the jaw, cutting all tissues down to the bone, and another incision from the angle of the jaw clear down and around to the posterior portion of the neck. The periosteum, or membrane covering the bone, was found to be ruptured, and, by slitting back the periosteum from the bone, cheesy material rolled out; it was all curetted and cleaned out, then tubes were inserted to get drainage. The second operation was on October 29. The tissues had all become very much swollen from increased blood supply, and it all had to be cut open as deep as the first time. November 8 was the third operation, and Dr. Carnazzo testified: "We found there was a tablespoonful of pus over the junction of the temporal-mandibular joint; parotid gland edematous; capsule distended; tissues in neighborhood necrotic." He testified

he made a right-angle incision over right temporal-mandibular joint. A fourth operation was performed, for the sinus was still draining, so the boy's jaw was opened up, and dead bone was removed. Many of the hospital charts were introduced. The entry on the chart for this last operation, which occurred on July 17, 1931, states that there was an excision of bone, and a plastic operation on the face, and exostosis over corner of mandible, and the bone looked honeycombed. The great scar on the jaw was described as a keloid. It might be an aid to clarity to define it. Keloid is a "new growth or tumor of the skin, consisting of whitish ridges, nodules, and plates of dense tissue. These growths tend to recur after removal, and are sometimes tender or painful." Dorland's Medical Dictionary (16th ed.)

At the time of the trial Dr. Carnazzo testified that the boy still insisted upon wearing a complete head bandage constantly to cover the scars and the lumpy jaw, and thereby to avoid embarrassment. At the time of the hearing in the supreme court, the boy was present in the rear of the courtroom, but Judge Rose, presiding, refused permission of appellee's counsel to bring the boy forward and exhibit him to the court.

■ The plaintiff contends that he never had the proper or orthodox diagnosis or treatment while in defendant's hands, and charges that the defendant extracted the tooth without proper diagnosis of the condition, probed in the socket as long as he could get the boy's mouth open, tried to stretch the jaws to get inside, bruising them, prescribed sedatives and alternate use of hot and cold packs, under which his condition rapidly grew worse; diagnosed the swelling in the neck and glands as mumps, advised use of hot flaxseed; had him continue to come to his office when he was very sick, and should have been hospitalized and given complete rest; that defendant never recognized any of the symptoms of the severe afflictions from which the plaintiff was suffering.

The welfare of the citizens of a state demands that a

person practicing medicine and surgery must not only possess the ordinary learning and skill which is ordinarily possessed by others of his profession in that vicinity, but he must exercise such reasonable and ordinary skill and judgment, as well as diligence, in treating the particular case entrusted to him.

While the law does not require absolute accuracy, nor the utmost degree of care and skill, and a physician is not ordinarily liable for errors in judgment, yet an error of judgment may be so gross as to be inconsistent with that degree of care and skill which it is the duty of every physician to use. *West v. Martin*, 31 Mo. 375, 80 Am. Dec. 107; *Grainger v. Still*, 187 Mo. 197, 70 L. R. A. 49; 21 R. C. L. 379, 391, secs. 26, 36; *Stohlman v. Davis*, 117 Neb. 178.

Malpractice may consist in a lack of skill or care in making the diagnosis, as well as in the treatment of the ailment. *Cook v. Moats*, 121 Neb. 769, 78 A. L. R. 694; 48 C. J. 1113.

■ In considering the rules of law applicable to alleged malpractice by dentists, "the rules governing the duty and liability of physicians and surgeons in the performance of professional services are applicable to practitioners of the kindred branches of the healing art, such as dentists." 21 R. C. L. 386, sec. 30. The general topic of malpractice by dentists is discussed in the long notes and annotation, 69 A. L. R. 1142. *Walter v. England*, 24 Pac. (2d) (Cal. App.) 930; *Nelson v. Painless Parker*, 104 Cal. App. 770.

A finding that dentist did not exercise reasonable skill in injecting local anasthetic in gum, and extracting tooth without determining cause of, or taking measure to reduce, infection, held supported; and that dentist's failure to exercise reasonable skill in determining cause of swollen condition before injecting local anasthetic, and extracting tooth, was cause of osteomyelitis of patient's jaw, held supported. *Roberts v. Parker*, 121 Cal. App. 264.

In the third circuit (C. C. A.) the court held in *Brumberger v. Burke*, 56 Fed. (2d) 54, that the circumstantial

evidence developing permissible fact inferences is sufficient to take to the jury question whether osteomyelitis of jaw was caused by dentist's negligence. "Osteomyelitis is a disease which is caused by invasion of the bone by a germ, mainly from the mouth. A tough, fibrous membrane—the periosteum—immediately under the gum covers the bone and normally prevents such invasion. If the periosteum is cut or broken down from some cause or other, as by a loose tooth or contact with dental instruments, and not properly treated, the bone is exposed to osteomyelitic germs, invasion of the bone sets in and osteomyelitis may follow."

The defendant sets out the failure to give each of 18 instructions offered by him, and refused by the court, as assignments of error. In our opinion, there was no error committed in refusing each one of these instructions.

Complaint is made of five instructions given by the court. We are inclined to the view that the instructions given were, as a whole, so favorable to the defendant that he has no ground for complaint. Upon the rulings on the admission of evidence, the plaintiff was held very strictly to the rules of evidence, and we do not find that the defendant has ground of complaint. We have examined all of the 40 assignments of error of the defendant, and find no prejudicial errors.

■ We will now consider the cross-appeal of the plaintiff. Suit was brought for $50,000, together with the cost of the medical and hospital expenses, and the jury returned a unanimous verdict for $15,000. The trial court saw fit to cut this verdict down one-half, and directed that, if the plaintiff did not file a remittitur for $7,500, the motion for new trial would be sustained. After verdict has been fairly rendered in malpractice case, all circumstances and reasonable inferences to be drawn therefrom will be marshaled in support of the verdict.

This young boy is disfigured for life, with a great bulging scar, called keloid, upon his face, and our court has held in a case of permanent disability the jury might

consider the plaintiff's age. In this case the boy for years persisted in wearing a covering to hide it, the same as many people attempt to cover a birthmark. It will always be a source of embarrassment to him, and doubtless disqualify him from holding certain positions which he might otherwise be qualified to fill.

There seems to be general agreement that osteomyelitis is a disease which may return, and it is possible to conclude from the evidence that the four operations and curettement of the jawbone may have left the jaw in a weakened condition. The Texas court upheld a verdict of $12,-325 where a machinist sustained a broken jaw and injuries which disabled him from following his occupation. *St. Louis, S. F. & T. R. Co. v. Kaylor*, 284 S. W. (Tex. Civ. App.) 983.

The California court, in a case where a girl of 13 years had the flesh torn from the side of her face, sustained a jury's verdict in the sum of $15,000. *James v. Oakland Traction Co.*, 10 Cal. App. 785. The same court upheld a judgment of $15,000 in favor of a woman, 27 years of age, who received an injury to her face and neck. *Kelley v. Hodge Transportation System*, 197 Cal. 598. The New Jersey court sustained a verdict of $17,000 where a man suffered facial disfigurement. *Duryee v. Yellow Cab Co.*, 4 N. J. Misc. 338.

Our Nebraska court has upheld verdicts in the following amounts: *Glarizio v. Davis*, 110 Neb. 679, for $13,-000, where a 62-year-old man lost a leg; *Wilson v. Omaha & C. B. Street R. Co.*, 99 Neb. 693, for $10,500, for a woman 38 years of age; *Olson v. Hansen*, 122 Neb. 492, for $10,000, for a man 43 years of age; *Stewart v. Wabash R. Co.*, 105 Neb. 812, for $16,500, for a man 29 years old; *Thomas v. Otis Elevator Co.*, 103 Neb. 401, verdict upheld for $25,000.

This young lad endured pain and suffering for months while the jawbone was draining from the infection. He has a permanent disfigurement from the lumpy jaw and thick scars, and he will suffer humiliation therefrom. He

lost about two years of schooling, and, with the chance of a recurrence of the trouble, there is a possibility of additional medical expenses to those now accumulated, of around $2,000.

■ "Where the damages awarded by the jury appear to be excessive, the trial court may either grant a new trial absolutely, or give the plaintiff the option to remit the excess, or a portion thereof, and order the verdict to stand for the residue. But since the assessment of damages is peculiarly the province of the jury, the court will be very cautious in overthrowing verdicts on this ground, and when it appears that the verdict is not clearly exorbitant, and that the case has been tried in a fair and impartial manner, a new trial will be refused. No mere difference of opinion, however decided, justifies an interference with the verdict for this cause." 20 R. C. L. 281, sec. 64.

Section 20-1929, Comp. St. 1929, provides that, when a remittitur has been made and the case appealed, the party remitting shall not be barred from maintaining that said remittitur should not have been required, either in whole or in part.

■ In *Miller v. Central Taxi Co.*, 110 Neb. 306, the trial judge directed a remittitur, and it was held that the remittitur was excessive, and a portion thereof was ordered vacated and set aside, and a judgment for the balance, as of the date of the rendition of the judgment in the district court, was directed by this court. The case of *Christoffersen v. Weir*, 110 Neb. 390, is also to the same effect.

In *Hellerich v. Central Granaries Co.*, 104 Neb. 818, the verdict of $28,900 was returned by the jury, which the trial court ordered cut $10,000, and this court said, after examining the facts, that the judgment does not appear so excessive as to require a reversal or an additional remittitur.

In *Curran v. Union Stock Yards Co.*, 111 Neb. 251, this court directed a $10,000 remittitur to be filed where the

verdict returned by the jury was for $32,000, and stated: "The damages are for the determination of the jury, and it is with the greatest reluctance the courts will, in a manner, substitute their judgment for that of the jury."

In *Finkelstein v. City of Chicago*, 168 Ill. App. 475, it is said: "It is not the province of this court to assess the amount of plaintiff's damages, but it is within our province to determine where, as here, it appears clearly from the evidence that the amount of the judgment is excessive, what if any part thereof it would be proper for us under the evidence to affirm in case the plaintiff chooses to remit the excess." See *Campbell v. Sutliff*, 193 Wis. 370, 53 A. L. R. 771.

In *Lindley v. Wabash R. Co.*, 120 Neb. 204, on rehearing, this court had before it a verdict of $24,375, and said: "Unless there is evidence to indicate that the jury acted from caprice, passion, or prejudice, a reviewing court will not disturb the verdict, unless it can say, as a matter of law, that the verdict is so excessive as to be unjust and to require a remittitur or a reversal."

The members of the court who heard this case do not believe that the verdict of the jury was as much illegal and excessive as the trial court. We see no reason for discounting it 50 per cent. We believe there is merit in the contention of the plaintiff that he was required to remit an excessive amount of the verdict the jury returned in his favor. We think that a reduction of $5,000, or one-third of the verdict, would have been ample. It is ordered that the remittitur in excess of $5,000 be vacated, and a judgment entered for the plaintiff for $10,000, as of the date of the rendition of the judgment in the district court. As herein modified, the judgment is affirmed.

AFFIRMED AS MODIFIED.