ELLA G. MEYER, AS EXECUTRIX OF THE LAST WILL AND TESTAMENT OF CLIFFORD MEYER, DECEASED, APPELLANT, V. L. D. MOELL, ALSO KNOWN AS DWIGHT MOELL, APPELLEE.
183 N. W. 2d 480

Filed February 5, 1971. No. 37501.

Ginsburg, Rosenberg, Ginsburg & Krivosha, R. P. Cathcart, and Bernard Wishnow, for appellant.

Cline, Williams, Wright, Johnson & Oldfather, William B. Rist, and Kevin Colleran, for appellee.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ.

WHITE, C. J.

This is an appeal from a jury verdict and a judgment for the defendant in a malpractice action. The errors assigned relate to alleged error in the instructions given by the trial court and in the admissibility of evidence. We affirm the judgment of the trial court.

There is no contention on appeal in this court that the evidence is insufficient to support the verdict and judgment for the defendant. However, as a matter of clarity in the examination of the issues presented, a fairly comprehensive statement of the facts will be given.

The defendant is a doctor engaged in the practice of medicine in Beatrice, Nebraska. On Friday, November 11, 1966, plaintiff's decedent, Clifford Meyer, sustained serious injuries in a farm accident when his right arm was caught in an unloading elevator on a farm wagon. He was immediately taken by his son to the Lutheran Hospital in Beatrice, Nebraska, where the defendant Dr. Moell, at the time, happened to be attending other patients. Dr. Moell was immediately engaged to treat Meyer. The record shows that the injuries to the right

arm were very severe. They centered around the elbow, with wounds extending in both directions, approximately half-way to the wrist and up into the upper arm half-way to the shoulder. There was an open fracture of the elbow with a dislocation of the elbow joint between the two bones. The radial nerve was exposed and an examination revealed that he had fractures of both bones of the forearm in the upper area. He had a fracture of the large bone in the shoulder area. In addition, Dr. Moell's examination revealed that besides the severe wounds to the right arm, decedent had an irregularity of the heart and his blood pressure was low, which remained low for some time, running as low as 70 systolic; and the doctor found that he was in shock. Treatment was immediately undertaken by Dr. Moell, including the administration of intravenous fluids, blood, and drugs to contract the blood vessels and bring the blood pressure up. The initial examination was completed with the usual X-ray confirmation and the decedent was taken to surgery the next morning. This operation started at 9:15 a.m., took 2 hours and 35 minutes to complete, and consisted of a debridement or cleaning of the wound of all foreign matter and dead tissue. At the conclusion of the operation the wound was thoroughly irrigated and each piece of tissue that remained was inspected to see if it appeared to be normal. Dead tissue was cut away, and any pockets present were opened up and irrigated in order to get the wound in as clean a state as possible at the end of the operation.

The evidence shows that Dr. Moell, after debriding the wound, had to reach a judgment as to the closure of the wounded area. Complicating factors were an exposed nerve, an exposed joint capsule, and an exposed fracture. A factor involved after cleaning the wound and the determination of exposure in this particular case was that there was an open area where the exposed nerve might be affected by its exposure to the air and

also the "joint capsule" could possibly be affected by the same exposure. Dr. Moell came to the conclusion as to the degree of closure in this area, and the deep area was loosely closed with catgut or absorbable sutures. Drains were affixed and the wound was closed. Dr. Moell observed at that time that the tissues which remained after the debridement appeared to be in good condition and there was apparently good circulation in these areas. At the conclusion of the operation a light dressing was placed over the whole area and the arm was placed in a splint.

Subsequently, the deceased was given additional blood transfusions (standard treatment for shock), and medication for pain; and tests were ordered to test his kidney function, which revealed that his blood urea nitrogen (BUN) was elevated. A broad spectrum antibiotic was ordered. This was indicated because of the nature of the accident and the uncertainty of what type bacteria, gram-negative or gram-positive, was present.

Dr. Moell saw decedent the evening of the accident, after the operation, again Saturday morning, checked with the hospital Saturday afternoon, and visited decedent again Saturday evening. At these times his condition appeared to be progressing satisfactorily. On Sunday morning decedent requested that medication for relief of pain be by mouth and he seemed to be feeling better and having less pain. Dr. Moell saw decedent again Sunday evening. At 5 a.m., on Monday, November 14, 1966, following a call from the hospital, Dr. Moell again saw decedent; noted that his blood pressure was dropping; that his pulse was rapid; and that he again appeared to be in shock. Dr. Moell ascertained at that time that there was apparently a complete kidney shutdown, and this being a life-threatening problem, he made the judgment that decedent should be transferred to Lincoln for further or more extensive treatment. Dr. Moell talked to Dr. Webster in Lincoln, an orthopedist, arranged for copies of the hospital records to be made,

and for an ambulance to be called to take decedent to Lincoln. He changed the medication prescribed to conform to the condition he found present and gave a heart support medication, digitalis. An electrocardiogram was ordered, the dressings on the wound were changed about noon on that date, at which time the doctor noted a discoloration of the skin in the wound and an odor to the wound drainage, and determined that further debridement would be required. It appeared at this time that the basic problem was the kidney function.

Decedent was transferred to Bryan Memorial Hospital in Lincoln, Nebraska, on Monday afternoon, arriving at about 5 p.m. From that time on he was under the care of an orthopedic surgeon, an internist, a urologist, a general surgeon, and a radiologist.

It appears from the record that these doctors were uncertain themselves as to why decedent was in shock and why he was suffering from an acute kidney shutdown. After discussing various alternatives and the results of their examinations, they came to a diagnosis of shock, acute kidney shutdown, and a possibility of a gangrene infection. Later that evening the diagnosis of gas gangrene was made at approximately 10 p.m. after dressings were changed by Dr. Webster, the orthopedist, between 9:30 and 10 p.m., and a culture was taken which revealed gas gangrene organisms. Surgical action was immediately taken and decedent's arm was amputated at 11:30 on Monday evening. Death occurred at about 6:50 a.m. the following morning, Tuesday.

Autopsy revealed a previous heart condition which had already been reflected by the electrocardiogram that Dr. Moell had ordered. By autopsy, a substantial enlargement of the heart and sclerosis of the coronary arteries were shown. All of these conditions, according to the opinion medical testimony, could have been affected by the kidney condition and shutdown. The evidence reveals that death was caused by the cardiac condition. There was uncertainty in the medical opin-

ions as to just what conditions contributed to or accelerated the heart condition. One doctor (Frerichs) was of the opinion that the gas gangrene in the wound did not cause the kidney failure in this case since the microscopic sections of the kidney following autopsy did not reveal the findings which would be expected if the kidney failure was caused by gas gangrene.

The evidence shows that gas gangrene is an uncommon condition and seen very rarely by doctors in the geographical area of practice of Dr. Moell. There was testimony that a general practitioner might see one case in 10 years. The condition may develop even with the best of medical care. For the condition to develop, an incubation period of from 24 hours to 3 or 4 days is required. This is a brief summary of the pertinent evidence with respect to the history of the deceased's medical condition and care up until the time of his death.

The expert testimony centers around (1) whether it was negligence on the part of Dr. Moell to close the wound as he did at the time of the original operation, and (2) whether there was failure to examine the wound at different specific times and to give the deceased additional or different antibiotics.

Instructions Nos. 8 and 12 are attacked by the plaintiff, as conflicting and misleading. These instructions are set out as follows:

"INSTRUCTION NO. 8 * * * By 'negligence' with respect to this lawsuit is meant the doing of some act under the circumstances which a doctor in general practice of medicine in Beatrice or similar localities would not have done or the failure to do some act or to take some precaution which a doctor in general practice of medicine in Beatrice or similar localities would have done or taken."

"INSTRUCTION NO. 12 * * * The law does not require a doctor absolute accuracy either in his practice or judgment. It does not hold him to the standard of infallibility, nor require of him the utmost degree of

skill known to his profession. It requires of him only that in the practice of his vocation he shall exercise that degree of care, skill and learning ordinarily possessed and used by members of his profession in his or similar localities."

We are required to consider all instructions together, as the trial court told the jury in this case. Instruction No. 11 was also given which stated: "In performing professional services a doctor engaged in general practice must use the skill and knowledge ordinarily possessed and used under like circumstances by members of his profession engaged in the general practice in his or similar localities."

We have no difficulty in discovering precisely what the proper and applicable rule is in Nebraska. In determining what constitutes reasonable and ordinary care, skill, and diligence on the part of a doctor in a particular community, the test is that which physicians and surgeons in the same neighborhood and in similar communities, engaged in the same or similar lines of work, would ordinarily exercise and devote to the benefit of their patients. Stohlman v. Davis, 117 Neb. 178, 220 N. W. 247, 60 A. L. R. 658; Mangiameli v. Ariano, 126 Neb. 629, 253 N. W. 871. See, also, the recent pronouncement in Foley v. Bishop Clarkson Memorial Hospital, 185 Neb. 89, 173 N. W. 2d 881. The above rule is the majority rule in most jurisdictions and is in harmony with the Restatement of the Law of Torts. See Restatement, Torts (2d Ed.), § 299A, p. 73 (1965). It is unnecessary to engage in a detailed semantical comparison of the apposite language from these three instructions. It is apparent there is no conflict between the instructions when read together, and they succinctly and properly state the rule. We can see nothing in the somewhat overlapping and repetitive nature of these instructions which could, in any way, possibly mislead the jury. There is no merit to this contention.

Although the plaintiff contends otherwise, it is clear

from an interpretation of instruction No. 8 and instruction No. 11 that the court instructed the jury the doctor must not only possess a certain degree of skill and knowledge but that he must use such skill and knowledge in the particular case at issue.

What we have said disposes of the plaintiff's contention that her requested instructions should have been given. The record reveals that the plaintiff presented and tried this case on the theory of the locality rule. The court properly applied the locality rule to a definition of the term of negligence, to the degree of the standard and skill of a doctor in the community, and to the requirement that he not only possess such knowledge but *use* it in the particular case. A party cannot complain of the giving of an instruction in harmony with the one which he requested. Ballantyne v. Parriott, 172 Neb. 215, 109 N. W. 2d 164; Spani v. Whitney, 172 Neb. 550, 110 N. W. 2d 103. He will not be permitted to change his theory on appeal. Sorter v. Citizens Fund Mut. Fire Ins. Co., 151 Neb. 686, 39 N. W. 2d 276; Crunk v. Glover, 167 Neb. 816, 95 N. W. 2d 135. Error may not be predicated solely upon a particular sentence or phrase, but must appear from a consideration of all of the instruction of which such sentence or phrase is a part, and all of the remainder of the charge to the jury. Leonhardt v. Harimon, 185 Neb. 224, 174 N. W. 2d 926; Zager v. Johnson, 175 Neb. 866, 124 N. W. 2d 390.

Finally, it is the plaintiff's contention that it was error to permit Dr. Porter to testify as to his experience in similar cases, with respect to debridement and closure of wounds, in the locality of Beatrice. It is further contended that it was error to enlarge upon this testimony with demonstrative evidence in the form of colored slides. Her basic contention is that this is collateral evidence, immaterial to the direct issues in the case, and is inadmissible and prejudicial. It is necessary to examine the status of the record on this issue. It reveals that the plaintiff's expert witness, one Dr. Robert Gil-

lespie, testified that *under no circumstances* should any deep wound which has been contaminated be closed. A permissible, if not the clear, inference from his testimony is that the mere act of closing the wound was contrary to the accepted practice in Beatrice and in similar communities. This doctor supported his testimony with a statement that he was a member of the American College of Surgeons and that its Committee on Trauma indicates in its recommendation that a wound when debrided should be left open. In one portion of his testimony he stated that all contaminated wounds should be left open after they have been thoroughly debrided.

To meet this contention Dr. Moell called Dr. Porter who also is a member of the American College of Surgeons and is engaged in the practice of medicine in the Beatrice area and in which Dr. Gillespie is not. The following testimony was permitted by the plaintiff without objection: "There's been some testimony here, Doctor, that under no circumstances should a wound of this type be closed but it should be packed open and the failure to do so constituted a failure to meet the standard of care existing in this area. What is your testimony in this respect? * * * Well, I treat quite a few dirty wounds from automobile accidents and farm accidents and if I have converted a wound from a dirty wound to a clean wound, in my opinion, I have no qualms about putting drains in and closing this wound. And I know many other doctors that do the same." It is clear, since there was no objection or motion to strike with reference to this testimony, that error may not be predicated thereon. State v. Dillon, 175 Neb. 444, 122 N. W. 2d 223; American Oil Co. v. City of Omaha, 182 Neb. 532, 155 N. W. 2d 805.

After this testimony was admitted, Dr. Moell offered the colored slides which were objected to by the plaintiff as collateral evidence and improper impeachment, and she now contends that the overruling of this objec-

tion was error. It is clear that these slides were no more than explanatory of the oral testimony of Dr. Porter. They were offered and received for the limited purpose of permitting the doctor to demonstrate to the jury the kind of dirty wounds that have been treated by loose closure over drains in the practice area of Dr. Moell and the results obtained in those cases. We have held that where evidence is objected to which is substantially identical with evidence admitted and not objected to, prejudicial error will not lie because of its admission. Danner v. Walters, 154 Neb. 506, 48 N. W. 2d 635. The admitted testimony was directly related to and rebutted the probative value of the testimony of the plaintiff's witness, Dr. Gillespie, which emphasized that in contaminated wounds debridement and closure should never be used. Even if the testimony could be considered collateral or cumulative such admission rests within the sound discretion of the trial court. Fitch v. Martin, 84 Neb. 745, 122 N. W. 50; O'Dell v. Goodsell, 152 Neb. 290, 41 N. W. 2d 123; Horky v. Schroll, 148 Neb. 96, 26 N. W. 2d 396. There is no merit to these contentions. The overall and most important issue tried in this case was the judgment of Dr. Moell in the debridement and closure of a contaminated wound. In light of this fact, it is impossible to see how the admission of this rebutting testimony, directly bearing on what the practice was in the local community, could have been in any respect prejudicial to the plaintiff.

It is unnecessary to examine other assignments of error as they are without merit.

The judgment of the district court is correct and is affirmed.

AFFIRMED.