JESSIE M. KORTUS, APPELLANT, v. WERNER P. JENSEN, APPELLEE.
FRED KORTUS, APPELLANT, v. WERNER P. JENSEN, APPELLEE.
237 N. W. 2d 845

Filed January 22, 1976. Nos. 40057, 40076.

William J. Riedmann and E. Terry Sibbernsen of Riedmann & Welsh, for appellants.

Lyle E. Strom and C. L. Robinson of Fitzgerald, Brown, Leahy, Strom, Schorr & Barmettler, for appellee.

Heard before SPENCER and BOSLAUGH, JJ., and WARREN, VAN PELT, and FAHRNBRUCH, District Judges.

WARREN, District Judge.

Plaintiff Jessie M. Kortus brought this medical negli-

gence action against the defendant Werner P. Jensen, M.D., for a sciatic nerve injury she sustained while undergoing hip surgery by the defendant. The plaintiff Fred Kortus filed a separate action for the husband's loss of consortium. The two actions were consolidated for trial. At the conclusion of the plaintiffs' case-in-chief, the trial court sustained the defendant's motion for dismissal of the respective actions. Plaintiffs appeal. We affirm.

Plaintiff Jessie M. Kortus, to whom we hereafter refer as the plaintiff, age 39, suffered from degenerative arthritis of the left hip. After consultation and examination, the defendant recommended a total hip arthroplasty, surgical reconstruction of the hip joint. A thorough discussion of possible problems was had, her husband was consulted, and plaintiff consented. Plaintiff underwent surgery on November 3, 1972, at Archbishop Bergan Mercy Hospital, where she had been employed as a medical secretary up to that time. Plaintiff first noticed a numbness and pain in her left leg on the afternoon of the day of surgery, which continued until her discharge from the hospital on November 22, 1972. She left the hospital wearing a brace on her left foot and leg which she wore daily for almost a year in an attempt to alleviate the causalgic pain. A neurosurgeon, Dr. Daniel McKinney, twice hospitalized the plaintiff, for 29 days in December 1972, and for 27 days in January 1973, and performed lumbar sympathetic blocks by injection of a local anasthetic in the nerve area. Outpatient physical therapy followed. Pain medications were prescribed. On October 24, 1973, plaintiff was again hospitalized and Dr. McKinney performed a surgical sympathectomy to relieve the pain. Plaintiff continued to suffer a burning pain in her left foot, and was unable to do outside work or engage in her normal activities. The new hip joint itself functioned satisfactorily. She entered the hospital once more on July 22, 1974, for treatment of a stomach disorder and was discharged

July 31, 1974. Her condition improved and she returned to work as a medical secretary at St. Joseph's Hospital on August 5, 1974. Dr. McKinney testified that in his opinion the damage to plaintiff's sciatic nerve was occasioned by a stretching of the nerve at the time of the formation of the new hip joint. He further stated that plaintiff will continue to have some discomfort in her left foot for an indeterminate length of time, and that at time of trial she still experienced some sensory loss and numbness over the sole of her left foot, but showed good strength in her left leg and foot, except for some weakness in toe movement.

Plaintiff's petition alleges that during the course of the total hip procedure performed by defendant, "plaintiff suffered a traction type injury to the sciatic nerve which was incurred during the formation and insertion of the new hip joint by defendant" and that "the injury * * * was the direct and proximate result of the negligence of the defendant, Werner P. Jensen, in the formation and insertion of the Charnley-Mueller acetabular and femoral components."

We first note that there was no allegation in the pleadings regarding lack of an informed consent, and therefore such issue is not before the court.

Plaintiffs' sole assignment of error is that the trial court erred in directing a verdict for defendant at the conclusion of plaintiffs' case. We therefore review the record in accordance with the rule cited in Wees v. Creighton Memorial St. Joseph's Hospital, 194 Neb. 295, 231 N. W. 2d 570 (1975): "A motion for a directed verdict or its equivalent must be treated as an admission of the truth of all material and relevant evidence submitted on behalf of the party against whom the motion is directed, and such party is entitled to have every controverted fact resolved in his favor and to have the benefit of every inference which can reasonably be deduced from the evidence."

Plaintiffs relied upon a portion of the deposition of

the defendant, and the expert testimony by deposition of Donald S. Harder, M. D., of Denver, Colorado, to establish a prima facie case. Their testimony must be examined in some detail.

Dr. Jensen, the defendant, testified that he had practiced his specialty of orthopedic surgery in Omaha, as a board certified surgeon, since 1950. His testimony included an extensive history of experience and continuing education, including having performed 103 total hip procedures. He stated that the practice of orthopedic surgery in Omaha is comparable to, or the same as, the practice of orthopedic surgery throughout the country; that neither the American Board of Orthopedic Surgery nor the American Academy of Orthopedic Surgeons sets standards of procedure other than orthopedists discussing them at meetings. Defendant described the technique he used in the subject surgery, beginning with the Austin-Moore approach, and including the technical surgical procedure which he followed to prevent injury to the sciatic nerve, which involves leaving the sciatic nerve encased in its surrounding muscles, pulling the muscles out of the way and keeping the retractors right on the hip joint so as to not endanger the sciatic nerve; that the sciatic nerve at that point is the size of one's ring finger, that he did not observe the sciatic nerve in the instant operation, and did not make any effort to view the nerve. Defendant testified that the post-operative numbness in plaintiff's left leg was probably caused by a stretching of the sciatic nerve during the surgery; and that this was his first case of a post-operative complaint regarding injury to the sciatic nerve.

Dr. Donald S. Harder testified that he practices in Denver, Colorado, specializing in orthopedic and rehabilitative medicine. He is certified by the American Board of Orthopedic Surgery. He practiced medicine privately from 1964 until 1971 when he sustained a shoulder injury which prevented him from performing surgery. He presently teaches part-time at the University of Colo-

rado Medical Center where he operates a pain rehabilitation center. He had watched hip arthroplasty and total arthroplasty when they first came out. He had performed many arthroplasties of the hip of various types, but never a total hip arthroplasty.

Dr. Harder stated that he was familiar with the practice of orthopedic surgery in communities other than Denver, Colorado, and that he was not aware of any differences between the practice of orthopedic surgery in November of 1972 as between Omaha and Denver. He defined orthopedic surgery to include a total hip procedure. His testimony at this point is quoted because it is vital to this decision:

"Q. With reference to a total hip procedure Dr. Harder, are you familiar with the standards of care, if you will, the quality of performance imposed upon orthopedic surgeons during this procedure in Colorado?

A. Yes sir.

Q. With reference to the total hip procedure, are you familiar with the standard of care, that is, the quality of performance that is required of orthopedic surgeons doing this procedure nationally?

A. Yes. * * * Essentially the approach to the hip is a very standard approach which is used internationally. It is the Austin-Moore approach from the posterior, and it is this approach that is very standard. Now some of the techniques beyond that, there may be some differences from one locale to the next. * * *

Q. Dr. Harder, in your opinion as an expert in the field of orthopedic surgery, and your opinion based on reasonable medical certainty, were acceptable standards for the quality of care adhered to in the surgical technique utilized by Dr. Jensen, specifically, as he indicates in the operative report? * * *

A. Yes, I have an opinion, and my opinion is that it is not standard. * * *

Q. Dr. Harder, with reference to the performance of a total hip arthroplasty, by means of the Austin-Moore

incision, what in your opinion in November of 1972 in Omaha, Nebraska, would have been the acceptable standard with reference to care of the sciatic nerve? * *· *

A. Well, in the few hundred exposures I have made with the Austin-Moore approach, I have always dissected out the sciatic nerve completely and placed around it a soft Penrose type of rubber tubing and gently retracted it and had it visualized in the operative field at all times; and at no time did I ever expose the hip or dislocate the hip joint without first identifying the sciatic nerve. * * *

Q. In your opinion, would the failure to do so constitute an unacceptable practice of orthopedic surgery? * * *

A. I have an opinion.

Q. What is your opinion?

A. Yes. The answer is yes.

Q. Now, Dr. Harder, had the standard been followed which you have testified to here today, that is, in your opinion the acceptable standard, that is, isolating and dissecting out the nerve — assume for a moment that standard had been followed in November of '72 in Mrs. Kortus' case, are you able to form an opinion as an expert in orthopedic surgery and your opinion based on a reasonable medical certainty as to whether or not Mrs. Kortus, had your standard been followed, whether or not she would have sustained a traction-type nerve injury to her sciatic nerve?

A. Yes.

Q. What is your opinion? * * *

A. In my opinion, the complication of partial interruption of the sciatic nerve would not have happened."

Dr. Harder concluded with the opinion that based upon his study of X-rays and medical and hospital reports, the plaintiff's sciatic nerve was damaged by being placed under undue pressure or stretch during the total hip procedure, and that there was some resulting permanent damage in the leg.

In performing professional services a doctor who is a specialist must use the skill and knowledge ordinarily possessed and used under like circumstances by members of his specialty in good standing in his or similar localities. In the application of this knowledge and skill the doctor must also use reasonable care. Halligan v. Cotton, 193 Neb. 331, 227 N. W. 2d 10 (1975); NJI No. 12.01.

In determining what constitutes reasonable and ordinary care, skill, and diligence on the part of a doctor in a particular community, the test is that which physicians or surgeons in the same neighborhood and in similar communities engaged in the same or similar lines of work would ordinarily exercise for the benefit of their patients. Mecham v. McLeay, 193 Neb. 457, 227 N. W. 2d 829 (1975); Meyer v. Moell, 186 Neb. 397, 183 N. W. 2d 480 (1971).

Under the foregoing rules, proof of medical negligence (malpractice) requires two basic evidentiary steps, followed by proof relating to proximate cause and damages: (1) Evidence of the generally accepted and recognized standard of care or skill of the medical community in the particular kind of care; and (2) a showing that the physician or surgeon in question negligently departed from that standard in his treatment of the plaintiff. The burden of establishing *both* these essential elements rests upon the plaintiff's introduction of expert medical testimony. The doctrine of res ipsa loquitur is inapplicable here.

In Robbins v. Nathan, 189 App. Div. 827, 179 N.Y.S. 281 (1919), the court said: "The court correctly charged the jury: ' "The defendant was not a guarantor of his work, or the result that would follow; he is not an insurer as to the result. In other words, in this case, he was required to use the ordinary care of such a man having the ordinary skill in this locality; and, if he does not, the mere fact that there is a bad result is not enough, but you have got to trace it to his lack of skill, or his negligence." ' Despite the relative inex-

perience of plaintiff's expert, Dr. Harder, in this particular procedure, when compared to that of the defendant, we think Dr. Harder was sufficiently qualified as to knowledge of general standards of care in orthopedic surgery to make him competent to testify as to such standard of care or skill in Omaha, Nebraska, at the time in question. We recognize that medical standards of care and skill are becoming national, rather than local or regional. There are no state lines recognized in the Nebraska rules which speak in terms of "similar localities" and "similar communities." The evidence that Dr. Harder had never performed a total hip procedure, had not practiced surgery since 1971, had never performed surgery in Omaha, Nebraska, and had never examined the plaintiff are all matters that go to the weight of the evidence to be accorded by the trier of fact, and do not prevent the plaintiff's expert from testifying to a general standard of care and skill in Omaha, Nebraska, if he testifies that he is familiar with that standard. A specialist from one medical community is competent to testify as an expert witness in a medical malpractice case as to the standard of care or skill required in another community, if the witness has knowledge of and familiarity with the practice and standard of the locality in question or similar or like communities. Annotation, 8 A. L. R. 2d 772.

The problem here is, did Dr. Harder testify to a general standard of care or skill, or did he testify to his own practice or technique in a more limited type of operation? We conclude that Dr. Harder specifically testified to his own personal technique in identifying, dissecting out, and sheathing the sciatic nerve with rubber tubing, and then limited that personal technique to a more limited type of surgery, namely, hip arthroplasty, as contrasted with *total* hip arthroplasty where the entire hip joint is surgically reconstructed. Dr. Harder at no time testified that there was a generally accepted medical standard of care or skill which re-

quired identification, dissecting out, and sheathing of the sciatic nerve in performing a total hip procedure. We are left to speculate as to whether his personal procedure may have been superior or inferior to the technique used by defendant in more than 100 total hip procedures. Dr. Harder's personal technique is irrelevant. Defendant was not required to adhere to Dr. Harder's standard, but rather to the medically accepted standard in general use in Omaha and similar communities.

It is not enough merely to present the testimony of a doctor who would have acted differently, or who is willing to express the opinion that the operation should have been performed differently. The Supreme Court of Washington was presented with similar evidence in Hayes v. Hulswit, 73 Wash. 2d 796, 440 P. 2d 849 (1968). The court there concluded: "In the last analysis, all that plaintiff's evidence establishes is a difference of professional opinion as to diagnosis and treatment. This alone is not evidence of malpractice. * * * Our disposition of this case is governed by the rule announced in Richison v. Nunn, 57 Wn. 2d 1, 16, 340 P. 2d 793 (1959), and recently reaffirmed in Versteeg v. Mowery, 72 Wn. 2d 754, 435 P. 2d 540 (1967): * * * The testimony of other physicians that they would have followed a different course of treatment than that followed by the defendant, or a disagreement of doctors of equal skill and learning as to what the treatment should have been, does not establish negligence. In such cases, the court must hold that there is nothing upon which the jury may pass, the reason being that the jury may not be allowed to accept one theory to the exclusion of the other."

The reasons for this rule were stated in the early case of Gramaldi v. Zeglio, 3 N. J. Misc. 669, 129 A. 475 (1925), wherein the court said: "The fact that the plaintiff introduced evidence of physicians and surgeons that they would have made incisions in the arm which would

have laid it open from the wrist to elbow is not evidence of malpractice. Surgeons of eminence frequently differ in their opinions as to the treatment to be used in a given case. To permit a jury to pass upon the question of malpractice because testimony is given by physicians that they would have used a different treatment from the one prescribed or followed would be to make a physician or surgeon a guarantor of the success of his treatment in every case. If he fails to restore his patient, he must face a lawsuit with its accompanying annoyances and expenses. If the plaintiff's position be sound, a jury must pass upon the question whether the treatment given was correct or not. As the plaintiff did not respond to the treatment given and his arm became restored to its condition prior to the fracture, it could be expected that a jury would reach the conclusion that some other treatment of the condition which arose should have been applied. The result would be to return a verdict for the plaintiff, notwithstanding the same infection might have followed the other kind of treatment. If such were the law, there would be few physicians and surgeons who would undertake to treat a case. For every failure to effect a cure would lay the basis for a lawsuit. * * * It takes more than the opinion of one or more physicians or surgeons that the treatment followed in a given case should have been different to lay a foundation for malpractice." See, also, Boyce v. Brown, 51 Ariz. 416, 77 P. 2d 455 (1938); Willis v. Western Hospital Assn., 67 Idaho 435, 182 P. 2d 950 (1947); Fritz v. Horsfall, 24 Wash. 2d 14, 163 P. 2d 148 (1945); Hazen v. Mullen, 32 F. 2d 394 (Ct. App., D.C., 1929).

It should be obvious that the practice of medicine is not an exact science which can be accomplished merely by the routine following of prescribed procedures. On the contrary it, perhaps more than any other profession, involves the exercise of individual judgment within the framework of established procedures within the profession. Proof of a difference in judgment within that

framework cannot amount to a proof of malpractice since such differences of opinion are consistent with the exercise of due care, or even the highest degree of care.

If a standard of care or skill existed in Omaha, Nebraska, and similar communities in November 1972, requiring that the sciatic nerve be identified, dissected out, and cushioned in a total hip procedure, it would have been a simple matter for Dr. Harder to have said exactly that. Having failed to do so, the plaintiffs' evidence would not have supported a finding that defendant did not exercise that degree of care and skill which the law requires, and the trial court was correct in dismissing the actions.

AFFIRMED.

FAHRNBRUCH, District Judge, concurs in the result.