ROBERT J. GOLONKA, APPELLANT, v. JOHN W. GATEWOOD, APPELLEE.

257 N. W. 2d 403

Filed August 31, 1977. No. 40889.

Walsh, Walentine & Miles, for appellant.

Lyle E. Strom and C. L. Robinson for Fitzgerald, Brown, Leahy, Strom, Schorr & Barmettler, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, CLINTON, and WHITE, JJ.

SPENCER, J.

This is a medical malpractice action arising out of surgery performed by the defendant physician upon the plaintiff, Golonka, at Archbishop Bergan Mercy Hospital at Omaha, Nebraska, on August 24, 1970. A jury returned a verdict for the defendant. Plaintiff appeals. We reverse.

Plaintiff first saw Dr. Gatewood professionally on June 5, 1970. Plaintiff showed him a lump on the back of his left knee which had been present for 8 years. Plaintiff told him he had pain in the left knee and ankle when pressure was applied to the mass and numbness on the lateral surface of the left leg and top of the foot. The plaintiff also was concerned about a growth on his face which the defendant diagnosed as a sebaceous cyst. Plaintiff testified he selected defendant as a surgeon because he knew defendant did a lot of work in the area of plastic surgery and he was concerned about having a scar on his face after the removal of the facial growth.

In diagnosing the growth in the back of plaintiff's left knee, defendant took the history of the growth, examined plaintiff's blood pressure, listened to his heart, and felt the swelling behind the knee and attempted to move it up and down. Based upon this examination, defendant diagnosed the lump as a Baker's cyst. Plaintiff's family physician at some time prior to June 1970, had also diagnosed it as a Baker's cyst. Defendant recommended that the lump be surgicially removed. He indicated it was rather minor surgery and told plaintiff he would be back to work within 2 days.

When plaintiff entered the hospital he was asked

to sign and did sign a printed form which in its material portion and with certain blanks filled in, stated: "1. I hereby authorize Doctor Gatewood and/or such assistants as may be selected by him to perform the following operation(s) excision of L neck cyst and Baker's cyst - L knee upon the above named and/or any other therapeutic procedure that his judgment may dictate to be advisable for the patient's well-being.

"2. The nature and purpose of the operation, the risks involved, and the possibility of complications have been explained to me. I acknowledge that no guarantee or assurance has been made as to the results that may be obtained."

Golonka testified that no one gave any statement to him as to hazards or possible complications that might arise from the contemplated surgery other than defendant's statement that it was minor surgery. Actually, the situation was such that plaintiff had every reason to believe he was subjecting his person to only minor surgery consisting of the removal of two cysts, one from his face and one from behind his left knee.

Plaintiff was given a general anesthetic and rendered unconscious at approximately 7:45 a.m. on August 24, 1970. The defendant was assisted in surgery by Dr. Monson. During the course of the operation defendant cut the skin and divided the fascia, the covering over the muscles, and exposed the mass behind the plaintiff's left knee. As soon as defendant saw the growth he knew he was not dealing with a Baker's cyst, but rather a tumor of the peroneal nerve, a major nerve affecting the lower extremities. It controls the flexion of the foot and sensation to the top and lateral surface of the foot.

Defendant had never before removed a tumor of the peroneal nerve. He and Dr. Monson discussed the problem for approximately 15 minutes. They agreed the tumor could not be shelled out or enucle-

ated. Defendant testified the nerve fibers appeared to be permeated throughout the tumor. He further testified: "I didn't think that it should be enucleated. I thought this had a good possibility of being a malignant tumor, and therefore I didn't want to seed the area." He testified why he thought the tumor was probably malignant: "It was a very hard tumor. There was some redness on either end and over the top of it. And it was my judgment, after having seen many tumors over the years, that this had a good possibility of being malignant."

Defendant and Dr. Monson agreed that the proper course of action was to excise the tumor mass. Prior to making this decision the doctors palpated the tumor and lifted it by lifting the nerve at both ends and rotating it. Defendant then proceeded to resect the tumor. The nerve was cut on each side of the tumor and the tumor removed. About 1 inch of the peroneal nerve was removed in the process.

Defendant then sent the tumor and nerve which he had removed to Dr. Moran who was waiting in pathology. Completion of the surgery was suspended until Dr. Moran could examine it. He called a few minutes later advising the tumor was benign with no evidence of malignancy present. Defendant testified the tumor was sent to pathology for examination after it was removed because if the tumor was indeed malignant he wanted to remove some more of the nerve to make sure he got all of it. After receiving Dr. Moran's report, defendant then anastomosed the nerve in an end-to-end fashion.

When Golonka regained consciousness after surgery he found his leg fully encased in a plaster cast and flexed at an angle of about 70 degrees. It was at this time that he was first advised by Dr. Gatewood as to the nature of the surgery that had been performed upon him, namely surgical removal of a benign solitary neurilemoma, together with approximately 1 inch of the peroneal nerve. He was also

told that as a result of this surgery he would be totally incapacitated for some weeks or months, and that he would have some permanent impairment of the function of his left leg in an as yet unknown degree.

At the time of the surgery, plaintiff was 27 years old, in good health, and physically active. During his high school and college years he had been an athlete. Following surgery, plaintiff experienced considerable pain in his lower left leg. After a long and painful convalescence, plaintiff reached a point where he could walk with his left leg in a brace. At the time of trial he still had pain in his leg. He also had atrophy and altered sensation on the left side of the calf which he described as feeling like "if you take the hair on your arm and just pull it. Then when it really hurts, it's — sometimes it's like pouring boiling water on it." Prior to the operation, plaintiff was employed full time. He was forced to give up his job in March 1971. At the time of trial plaintiff was unemployed and was receiving a Social Security disability pension.

The only assignment of error we need to consider is plaintiff's principal contention on appeal. The District Court erred in failing to submit to the jury the question of whether defendant was negligent in failing to conduct proper and adequate diagnostic tests to determine the true nature of the growth behind plaintiff's left knee before undertaking surgery thereon. A specific request was made for this instruction, but it was not given in any form.

At the instruction conference plaintiff's attorney made the following comments concerning the tendered instruction which was refused by the court: "I will limit my remarks to the instructions of the Court as prepared for submission viewed by me. My first exception is to instruction No. 2, and the instruction (sic) is in failing to include as part of the allegations of negligence submitted to the jury. The

first allegation set forth in Plaintiff's petition as amended, to-wit: 'In failing to conduct proper and adequate diagnostic tests to determine the true nature of the growth behind Plaintiff's left knee before undergoing surgery thereon,' in this respect I claim no absolute magic for particular wording of the allegation, but my request is, and my exception is, that the Court should, either in the words I have suggested, or in some adequate and proper words, tender to the jury the question as to whether Defendant departed from the standard accepted medical practice in failing to do the most fundamental thing required of all surgeons, and that is to make a proper and adequate diagnosis of the tumor which he contemplates surgically removing before undertaking surgically (sic) thereon, particularly where the proposed surgery or the contemplated surgery involves permanent physical harm to the patient."

It is the duty of the trial court to instruct the jury upon the issues presented by the pleadings and supported by the evidence. Laux v. Robinson, 195 Neb. 601, 239 N. W. 2d 786 (1976). Plaintiff specifically requested the jury be instructed that plaintiff claims the defendant was negligent "in failing to conduct proper and adequate diagnostic tests to determine the true nature of the growth behind plaintiff's left knee before undertaking surgery thereon." This was the theory on which plaintiff predicated and tried his case.

It is argued plaintiff is actually contending it was the duty of defendant to make a correct diagnosis, or he had the obligation to correctly ascertain the true nature of the growth behind the plaintiff's left knee during the course of the surgery on August 24, 1970, when he became aware that the growth was not a Baker's cyst as originally thought but a tumor of the peroneal nerve. It is suggested this should have been done prior to making the decision to surgically remove the tumor and a portion of the nerve. Plain-

tiff's evidence may be so construed. There is evidence in the record if accepted by the jury which would sustain a finding that the defendant should have sent a sliver or wedge of the tumor to pathology before its removal.

Plaintiff's tumor was one of the peroneal nerve. Dr. Moran, the pathologist used by defendant, gave the following description of these tumors: "A nerve has many nerve fibers. It's like a telephone wire cable. And each fiber is covered by a layer of Schwann cells, and each fiber plus the Schwann cells is covered by a thin coating of connective tissue, neurogenic connective tissue, and then several of these are gathered in a bundle, and then several bundles are gathered together, but they are separated by this neurogenic connective tissue.

"So the neurofibroma arises from the connective tissue covering of a nerve, whereas a neurolemmoma (sic) or Schwannoma is a tumor of the Schwann cells alone. But most of these tumors are mixed. They have both elements, and we call them by the predominant element." The plaintiff's tumor, according to Dr. Moran, was a mixture of a neurilemoma and a neurofibroma, but was primarily a neurilemoma.

Dr. Lawrence J. Minette testified for the plaintiff by videotape deposition. He testified he studied the pathology slides prepared by Dr. Moran from the cross section cut from the tumor material removed from behind the plaintiff's left knee. He also obtained four paraffin blocks prepared by Dr. Moran containing additional tumor material and from these he cut and prepared additional cross sections of the tumor. On this basis he testified that the tumor, in his opinion, could have been carefully dissected away from the nerve; that a neurilemoma is a known entity; and that "generally it is accepted that a neurolemmoma (sic) should be dissected from the nerve with full preservation, as much as possible, of

the nerve and its function." He gave his opinion that the defendant should have dissected the neurilemoma from the capsule and nerve with preservation of the nerve and nerve function, and that in accordance with accepted medical standards practiced in the Omaha community, resection or excision of the neurilemoma and nerve tissue, such as was done by the defendant, should not have been done. Dr. Minette admitted that in attempting to enucleate a neurilemoma some portion of the nerve fibers may be cut.

Dr. Tapas K. Das Gupta also testified for the plaintiff by deposition. Dr. Das Gupta reviewed the slides prepared by Dr. Moran and Dr. Minette, and also had additional tissue slides prepared from the original paraffin blocks made by Dr. Moran. He gave his opinion that the plaintiff's tumor was dissectible without excision of the nerve. Dr. Das Gupta testified he was the coauthor of an article entitled, "Tumors of Peripheral Nerve Origin: Benign and Malignant Solitary Schwannomas" which appeared in scholarly journals in 1970, in which he stated: "The benign form of peripheral nerve tumors can be easily separated from the nerve trunk and there is no reason to resect any specified peripheral nerve."

Defendant testified the nerve fibers appeared to be permeated by the tumor material and, based upon the pathological report, it still appeared that way to him. The defendant interpreted the pathology report to the effect that the tumor permeated the nerve fibers and separated them; that it was interspersed between the nerve fibers and into them; and that it would not have been possible, in his opinion, to dissect them out. Dr. Monson testified the nerve went through the mass and was not identifiable. Dr. Moran testified the tumor conformed to the general description of a neurilemoma found in textbooks, where the nerve fibers are described as interspersed throughout the tumor.

Dr. Moran testified on cross-examination he would normally think that an 8-year-old fully encapsulated tumor was probably benign. The question asked him was: "Assume from the history of the patient from whom this tumor was removed that he had this growth behind his knee for eight years, and assume further that that tumor was encapsulated and of the size that you saw it to be. A. Well, you would normally think it was benign."

Dr. Browne, defendant's principal expert witness, gave similar testimony on cross-examination. When he was pinned down to probabilities, he testified: "I would think in those circumstances if you were making a judgment one way or the other, I would say it was probably benign. I would say that."

The proper procedure to follow, the plaintiff suggested, was to do a wedge biopsy on the tumor to determine conclusively whether it was benign or malignant prior to making a determination to excise it and a portion of the nerve. Dr. Walburn testified that, in his opinion, the standard of medical practice prevailing in Omaha in 1970 required that a frozen section of the tumor be taken before causing permanent damage to the nerve by surgery.

Dr. Browne testified that a biopsy is a standard recognized diagnostic technique available to a physician for arriving at an accurate diagnosis of the nature of a tumor prior to surgery. Defendant acknowledged that a biopsy can be made at the time of surgery to determine if a growth is benign or malignant.

Dr. Moran testified the tumor was of sufficient size to permit the taking of a wedge biopsy. If that had been done he would have used the same procedures he used in analyzing the whole tumor.

Defendant testified he was concerned about seeding the area with malignant cells. Dr. Walburn agreed that the seeding of malignant cells is a danger to be considered in all frozen sections. He also

acknowledged that any time one surgically invades a malignant tumor, such as in conducting a wedge biopsy or attempting to enucleate, there is a substantial risk of seeding the area with malignant cells.

Plaintiff's theory of the case as set forth in his tendered instruction and the evidence was not presented to the jury. The only issues submitted were the excision of 1 inch of nerve tissues when it was not necessary or proper to do so; failing to advise the plaintiff as to the risk inherent in the surgery; defendant's lack of experience with the removal of neurilemomas; and in failing to make the disclosures a reasonably careful medical practitioner in the same circumstances would have made.

A litigant is entitled to have the jury instructed as to his theory of the case as shown by the pleadings and evidence, and a failure to do so is prejudicial error. Zavoral v. Pacific Intermountain Express, 178 Neb. 161, 132 N. W. 2d 329 (1965). While much evidence was adduced on the failure to properly diagnose as evidence of negligence, this issue was removed from the jury's consideration by the failure to give the tendered instruction.

Malpractice may consist in the lack of skill or care in diagnosis as well as in treatment. We said in Cook v. Moats, 121 Neb. 769, 238 N. W. 529 (1931): "To make a skilful and careful diagnosis of the trouble from which the plaintiff is suffering is one of the fundamental duties of a physician, and if he fails in that regard as well as in the application of improper treatment, and damages result therefrom, he must answer therefor."

In In re Estate of Johnson, 145 Neb. 333, 16 N. W. 2d 504 (1944), we said: "The rule is: 'A patient is entitled to an ordinarily careful and thorough examination, such as the circumstances, the condition of the plaintiff, and the physician's opportunities for examination will permit, and, while he does not in-

sure the correctness of his diagnosis, a physician or surgeon is required to use reasonable skill and care in determining through diagnosis the condition of the patient and the nature of his ailment, and is liable for a failure, due to a want of the requisite skill or care, to diagnose correctly the nature of the ailment, with resulting injury or detriment to the patient.' ''

In the instant case, considering the fact defendant had had no previous contact with a tumor of the peroneal nerve, the instruction was essential for plaintiff's theory of the case. There was testimony of experts that a proper diagnosis was not made. The jury, if properly instructed, could have found defendant was negligent in excising the tumor and a part of the peroneal nerve before a test was made. In In re Estate of Johnson, *supra,* we said: ''It has repeatedly been held that 'there is a fundamental difference in malpractice cases between mere errors of judgment and negligence in previously collecting data essential to a proper conclusion, * * * thus, if he omits to inform himself, * * * as to the facts and circumstances, and injury results, he is not relieved of liability for errors of judgment.' ''

The failure to give the tendered instruction was prejudicially erroneous. We reverse the judgment herein and remand the cause for a new trial.

REVERSED AND REMANDED.

WHITE, C. THOMAS, J., concurring.

The trial court refused to instruct the jury on an issue essential to plaintiff's theory of the case, i. e., failure of defendant to properly diagnose by causing a wedge biopsy to be taken from the tumorous mass, prior to its excision. Expert testimony had been adduced to the effect that such a procedure was in accord with generally accepted standards of medicine and surgery in Omaha, Nebraska. Expert testimony was offered to the contrary. A jury issue was presented. It is for this error the judgment is reversed and the cause remanded for a new trial.

CLINTON, J., joins in this concurrence.

WHITE, C. J., dissenting.

For the following reasons I respectfully dissent from the majority opinion.

In both his brief and oral argument, plaintiff contends that the District Court committed error when it failed to instruct the jury on one of his theories of malpractice; and that the defendant was negligent in not properly diagnosing the growth behind plaintiff's left knee *after* defendant exposed it during the course of surgery and prior to its excision by defendant.

It is true, as the majority opinion notes, that the trial court has a duty to instruct the jury upon all issues *presented by the pleadings* which are supported by the evidence. Laux v. Robinson, 195 Neb. 601, 239 N. W. 2d 786 (1976). However, a careful review of the record in this case shows clearly that the plaintiff never sought, either by his pleadings or otherwise during the course of the trial, to have the jury instructed upon defendant's duty to diagnose the growth behind plaintiff's left knee after it had been exposed *during* the course of surgery. Both plaintiff's pleadings and his requests to the court, by their language, related to defendant's duty to make an adequate diagnosis *prior* to undertaking surgery upon the growth behind plaintiff's left knee.

In an amendment to his amended petition, plaintiff asserted that the defendant was negligent: "In failing to conduct proper and adequate diagnostic tests to determine the true nature of the growth behind Plaintiff's left knee *before undertaking surgery thereon.*" (Emphasis supplied.) Plaintiff never further amended his pleadings. Plaintiff requested that the court instruct the jury as follows: "The Plaintiff claims that the Defendant was guilty of one or more of the following specifications of negligence: 1. in failing to conduct proper and adequate diagnostic tests to determine the nature of the

growth behind Plaintiff's left knee *before undertaking surgery thereon.*" (Emphasis supplied.) At the instruction conference, plaintiff's counsel, taking exception to the court's failure to give his tendered instruction, stated that the court should instruct the jury on the obligation of the defendant to make an adequate and proper diagnosis of the tumor which he contemplated surgically removing before undertaking surgery thereon.

The District Court refused to instruct the jury as ostensibly requested by the plaintiff on the basis that there was no evidence that the defendant had departed from any standards of the community or of similar communities in regard to preliminary diagnosis. This ruling was correct. There was no evidence in the record to indicate that the defendant should have done any more than he did in examining the lump behind plaintiffs left knee. The failure of the District Court to instruct the jury on plaintiff's theory of malpractice as presented to this court was the result of plaintiff's failure to so request, or to present its theory to the District Court in a clear and unequivocal manner. A party cannot be heard to complain of an error which he himself has been instrumental in bringing about. Ballantyne v. Parriott, 172 Neb. 215, 109 N. W. 2d 164 (1961).

In any event, it is clear that plaintiff received a fair submission of his case to the jury. Plaintiff was allowed to present his evidence. Plaintiff's disability results from the removal of approximately 1 inch of his peroneal nerve. Plaintiff contends that defendant was negligent in removing this portion of nerve. Defendant testified that he removed this portion of the nerve because (1) he did not think that the tumor could be dissected from the nerve, or be enucleated, and (2) he felt that the tumor was probably malignant and was concerned about seeding the area with malignant cells. At trial, plaintiff, through his evidence, attacked both of these judgments.

Instruction No. 2, given to the jury by the court, read, in part: "In his petition, plaintiff alleges that defendant was negligent in the following particulars: 1. In excising approximately one inch of nerve tissue from behind plaintiff's left knee *when it was not necessary or proper to do so.*" (Emphasis supplied.)

The proper procedure to follow, plaintiff suggested, was to do a wedge biopsy on the tumor to determine conclusively whether it was benign or malignant, prior to making a determination to excise it along with a portion of the nerve. Defendant's failure to have a wedge biopsy taken, according to the plaintiff, was negligence. Dr. John Walburn, plaintiff's witness testified that, in his opinion, the standards of medical practice prevailing in Omaha in 1970 required that a frozen section of the tumor be taken before causing permanent damage to the nerve by surgery.

Dr. Moran testified that the tumor was of sufficient size to permit the taking of a wedge biopsy. He further testified that it did not surprise him that the tumor was sent to him in its entirety, rather than a simple wedge biopsy, because that was a fairly common practice in the community. Defendant testified that it is not the practice in Omaha to perform a biopsy on a tumor of the size of plaintiff's. Defendant testified that it is the general practice of surgery in Omaha for the surgeon, in the exercise of his judgment during the course of surgery, to make a determination of the lesion or tumor which he is operating on. In his opinion, the procedures which he followed conformed with the standards of practice in Omaha. In response to a hypothetical question, Dr. Claude H. Organ testified that the surgeon, based upon the assumed facts, "exercised good judgment and I know of no things in the surgical management of this that was not done." Dr. Monson testified that, in his opinion, the defendant complied with good surgical practices of the community in the diagnosis of this

tumor and the judgments that he reached in the method of its removal and in the management of the patient during the course of that operation. Dr. Kenneth Browne, a neurosurgeon practicing in the Omaha community for 25 years, stated that he has never seen a tumor of the peroneal nerve. He testified that such tumors are so rare that it cannot be said there was a standard approach to these tumors in Omaha.

Instruction No. 7, given to the jury by the court, stated in part: "By 'negligence', commonly referred to as malpractice in this type of case, is meant the doing of some act under the circumstances surrounding or leading up to the incident complained of which a doctor, who is a general surgeon, of ordinary prudence would not have done, *or the failure to do some act or to take some precaution* which a doctor, who is a general surgeon, of ordinary prudence would have done or taken, *according to prevailing recognized medical standards.*" (Emphasis supplied.)

The issue of whether or not defendant, according to prevailing recognized medical standards, under the circumstances of this case, should have caused a wedge biopsy to be taken on the growth behind plaintiff's left knee prior to making a determination to excise the growth and portion of the peroneal nerve was submitted to the jury.

Instructions to the jury should be considered as a whole and if they fairly submit the case and cover the issues, there is no prejudical error. Hadenfeldt v. State Farm Mut. Auto. Ins. Co., 195 Neb. 578, 239 N. W. 2d 499 (1976). Much of the evidence in this case was conflicting. A verdict by a jury based upon conflicting evidence will not be set aside on appeal unless it is clearly wrong. Grady v. Denbeck, 197 Neb. 795, 251 N. W. 2d 164 (1977).

Defendant entered the operating room believing that he would remove a Baker's cyst from behind

plaintiff's left knee. During the course of the operation, as he cut through the fascia and exposed the growth, he realized that the growth behind plaintiff's left knee was not a Baker's cyst, but instead a tumor of the peroneal nerve.

Defendant determined that plaintiff's tumor had a good possibility of being malignant. He did not attempt to enucleate the tumor or dissect the nerve fibers from the tumor because he did not think that this could be surgically done, and, believing the tumor to be malignant, he was concerned about seeding the area with cancerous cells.

Defendant testified as to why he thought that plaintiff's tumor was probably malignant: "It was a hard tumor. There was some redness on either end and over the top of it. And it was my judgment, after having seen many tumors over the years, that this had a good possibility of being malignant."

Defendant's determination that this tumor was probably malignant was not lightly reached. Surgery was suspended for about 15 minutes after the tumorous mass was exposed, while defendant and Dr. Monson discussed the tumor. The tumor was palpated and closely examined. Dr. Monson agreed with defendant that the tumor was probably malignant. The record shows that defendant has been practicing surgery in the Omaha community since 1939, with the exception of 4 years in the Army during which time he was stationed at a neurosurgical center. He obviously has encountered numerous tumors, though admittedly never one of this specific nerve, such tumors being very rare.

In response to a *hypothetical* question, Dr. Browne stated that a fully encapsulated, 8-year-old tumor of the peroneal nerve which was not causing any particular problems to the patient, would in his judgment probably be benign. However, regarding the specific facts of this case, Dr. Browne testified: "According to the testimony that I am acquainted

with, they felt it was probably a malignant growth and this would certainly be a reasonable conclusion, so far as I can tell from all the testimony that's been given.''

Defendant's determination that plaintiff's tumor was probably malignant was certainly a reasonable one. It was a judgment based upon almost 40 years of surgical experience. It was a judgment shared in by Dr. Monson.

It is clear from the record that had plaintiff's tumor in fact been malignant, the course of action taken by the defendant, excision of the tumor and portion of the nerve, was without qualification the proper way to proceed.

Plaintiff suggests that even though defendant thought the tumor malignant, he should have conducted a wedge biopsy prior to excising it along with the nerve, to determine conclusively whether or not it was in fact malignant. Given defendant's reasonable conclusion that the tumor was malignant, such a course of action - taking a wedge biopsy - would have constituted the grossest negligence by defendant.

Dr. Monson testified that even with a frozen section, it is sometimes not possible to tell whether a tumor is malignant or not. Defendant, believing the tumor malignant, did not wish to surgically invade the tumor and risk seeding the area with cancerous cells. He testified that there was no way to protect against seeding the area with malignant cells. Plaintiff's witness, Dr. Walburn, agreed that the seeding of malignant cells is a danger to be considered in all frozen sections and acknowledged that any time one surgically invades a tumor, such as in conducting a wedge biopsy that is malignant, there is a substantial risk of seeding the area with malignant cells. Dr. Organ testified that even though a surgeon thinks that a tumor is probably benign, he must protect against the possibility of seeding the

area with malignant cells and that this ordinarily means removing the tumor in its entirety.

Plaintiff, and a majority of the members of this court, place defendant in a position where he is damned if he doesn't order a wedge biopsy (for fear that the tumor, even though thought malignant, might turn out in fact to be benign) and damned if he does order a wedge biopsy (should the tumor turn out to be malignant as originally thought and the area seeded with malignant cells as a result). Such a position is certainly not condusive to the development of sound medical practice.

Defendant thought the tumor malignant and decided to excise it along with a portion of nerve. Defendant did not think that the tumor could be enucleated or the nerve fibers dissected out. Dr. Monson agreed and assisted with this course of action. Dr. Walburn would have conducted a wedge biopsy prior to making a decision on whether or not to excise the tumor. Drs. Minette and Das Gupta would have attempted to dissect the nerve fibers from the tumor. They felt that this could be done.

Plaintiff's evidence, viewed most favorably to him, merely shows that defendant had other options in dealing with this tumor and that other doctors would have acted differently.

What we recently held in Kortus v. Jensen, 195 Neb. 261, 237 N. W. 2d 845 (1976), is appropriate here: "It is not enough merely to present the testimony of a doctor who would have acted differently, or who is willing to express the opinion that the operation should have been performed differently. The Supreme Court of Washington was presented with similar evidence in Hayes v. Hulswit, 73 Wash. 2d 796, 440 P. 2d 849 (1968). The court there concluded: 'In the last analysis, all that plaintiff's evidence establishes is a difference of professional opinion as to diagnosis and treatment. This alone is not evidence of malpractice. * * * The testimony of other physi-

cians that they would have followed a different course of treatment than that followed by the defendant, or a disagreement of doctors of equal skill and learning as to what the treatment should have been, does not establish negligence. In such cases the court must hold that there is nothing upon which the jury may pass, the reason being that the jury may not be allowed to accept one theory to the exclusion of the other.' ''

The judgment of the District Court is correct and should be affirmed.