SANDRA ANDERSON, APPELLANT, v. Y. S. MOORE, M.D., APPELLEE.

275 N. W. 2d 842

Filed March 6, 1979  No. 41802.

Edward F. Fogarty of Guilfoyle, Fogarty & Lund and J. Michael Moeller, for appellant.

Fredric H. Kauffman of Cline, Williams, Wright, Johnson & Oldfather, for appellee.

Heard before SPENCER, McCOWN, CLINTON, and WHITE, JJ., and WARREN, District Judge.

SPENCER, J.

This is a medical malpractice action brought by Sandra Anderson against Y. S. Moore, M. D. At the close of the plaintiff's evidence the District Court sustained the defendant's motion for a directed verdict and plaintiff prosecutes this appeal. The issue involved is whether the doctor violated the standard of care in the Lincoln community by negligently diagnosing plaintiff's symptoms, and in prematurely discharging her from the hospital. We reverse.

Plaintiff, at the time of the incident giving rise to this action, was a 29-year-old resident of Lincoln, Nebraska. On August 4, 1974, she traveled to Fort

Collins, Colorado, to visit her estranged husband. Two or three days later, while still in Fort Collins, she experienced lower abdominal pains and vomiting. On August 8, 1974, she went by bus to Denver, Colorado, to stay with her brother. She still experienced stomach pains, was vomiting, and had diarrhea. The following day she entered a Denver hospital emergency room and was prescribed medication. On August 10, she returned by plane to Lincoln. That evening, while at her sister's home, the pain became more severe and she was taken to Bryan Memorial Hospital.

Plaintiff was admitted to the emergency room at Bryan Memorial Hospital at 9:55 p.m. The physician on duty, Doctor J. D. Nelson, conducted a physical examination. He observed abdominal tenderness, especially in the right lower quadrant. A vaginal examination revealed extreme tenderness in the right adnexal area and a creamy white vaginal discharge. Blood tests, X-rays, and cultures were taken. The diagnosis made by Doctor Nelson was possible pelvic inflammatory disease (PID), appendicitis, or viral gastroenteritis.

The defendant was plaintiff's regular physician. He was contacted by Doctor Nelson and prescribed Lomotil. Plaintiff returned to her sister's home, but when the pain did not subside after taking the medication, she called the defendant. He had her report to Lincoln General Hospital, where she checked in at 1 a.m., on August 11, 1974.

Plaintiff was examined by the defendant at Lincoln General Hospital. His notes indicate she was experiencing moderately severe pain in the lower abdominal region. Nausea, diarrhea, and vaginal discharge were present. Plaintiff did not have a fever. Defendant's impression was noted as probable PID. He also made a notation to rule out appendicitis, meaning he considered appendicitis a possibility. In these respects his diagnosis con-

formed to that made by Dr. Nelson. Defendant prescribed Demerol for the pain and ordered another blood test for a white blood cell count. He visited plaintiff again during his rounds that morning and observed she was feeling better and was not suffering from nausea. He directed that Demerol be given as needed and that penicillin be administered.

On August 12, defendant received the report on the X-ray taken at Bryan Memorial Hospital. It indicated a possible fecalith in the appendix. This suggested the possibility of appendicitis. The defendant then called in Doctor Richard Toren for surgical consultation. Doctor Toren examined the plaintiff on the evening of August 12, and made the following notation: " 'Patient examined, history reviewed. Very hard to evaluate because of over-reacting. Rectal exam reveals very tender when cervix manipulated. Abdomen difficult to evaluate. Bowel sounds are rare. Think this may still be PID. Will follow.' " Doctor Toren followed the case throughout plaintiff's stay at the hospital and continued to consult with the defendant.

From a review of his progress notes, the nurses' notes, and the medication chart, defendant described plaintiff's condition through August 14, as follows: "It was very stormy. She had a lot of pain, was very uncomfortable, required a lot of narcotics for relief of pain. She didn't get to sleep very much, I don't think. She had a miserable two or three days." During this period of time from August 11 to August 14, plaintiff was given penicillin injections. Her white blood cell count decreased from a high of 18,900 on August 11, to 11,700 on August 14.

On August 13, defendant directed that plaintiff be given light food as opposed to a liquid diet and that antibiotics be administered by mouth. The next day shots were stopped completely and penicillin was given by mouth. Plaintiff began to experience

nausea and vomiting. Defendant attributed this to the change in medication. He did not think it was caused by a bowel obstruction because this would be accompanied by a very distended, firm abdomen which plaintiff did not have. Further, plaintiff was not experiencing pain consistent with a bowel obstruction and was having bowel movements. Defendant prescribed Tigan to relieve the nausea and vomiting.

By August 16, plaintiff's condition had improved to the point where defendant could conduct a pelvic examination. Her pelvis was still tender but there were no masses. There was some fullness on the right side indicating salpingitis, or inflammation of the uterine tube. Plaintiff began vomiting on the night of the 16th, and defendant, thinking the oral medication might have to be discontinued, started plaintiff on intravenous fluid. Some vomiting continued during the early morning hours of August 17.

When defendant visited plaintiff during morning rounds on the 17th, she was much improved. She no longer had nausea; her abdomen was soft; and she was without pain. Plaintiff expressed a desire to go home and defendant was of the opinion she could be placed on an outpatient status. He discharged her from the hospital and prescribed penicillin to be taken orally. He instructed plaintiff to notify him if her condition worsened and also to report at his office at the end of a specified time, at which time he expected to do a physical and pelvic examination and to make further blood tests. Defendant testified that although he believed plaintiff could be released from the hospital, she was not completely well. This was indicated by tachycardia, or a rapid pulse rate, and the fact she had vomited during the night, most recently at 4:30 a.m. Plaintiff was discharged into the care of her mother at 9:10 a.m., on August 17, 1974. She never contacted the defendant after that time.

Plaintiff spent the following week with her parents in Deshler, Nebraska. She testified that after she had been home for a day she started to have a lot of pain, was vomiting, and had diarrhea. Toward the end of the week she began to feel better and returned to Lincoln on Saturday, August 24, 1974. She went to work on Monday and experienced no pain during the day. That night, however, the pain returned. She attempted to work on Tuesday morning but could not stand the pain. She called her mother-in-law who took her to another Lincoln physician, Doctor J. M. Stemper. Doctor Stemper examined plaintiff in his office and then had her admitted to Bryan Memorial Hospital at 4:20 p.m., on August 27, 1974. His diagnosis at the time was: Possible pelvic inflammatory disease (PID) or possible appendicitis. This is the same diagnosis made by defendant on August 11, 1974.

After a consultation with a surgeon, exploratory surgery was performed on August 28, 1974, by Doctor L. E. Tenney. A large inflammatory mass was discovered in the lower right quadrant of the abdomen. The small bowel was markedly distended and fecal matter was leaking from a defect in the ileum. There was a tremendous amount of contamination in the pelvic area, with fecal matter. The appendix was acutely inflamed. An appendectomy and ileostomy were performed. Attempted repair of the ileum was not considered suitable at that time. Instead, the bowel was divided at the affected area and the two segments were exteriorized. The peritoneal cavity was thoroughly irrigated and drains were inserted for the pelvic abscess. Plaintiff's recovery was somewhat slow because of the infection and a fistula which developed following surgery. She was released from the hospital on October 5, 1974, at which time she went home and was cared for by her mother. An ileostomy bag was attached to the exteriorized bowel.

On October 21, 1974, plaintiff reentered Bryan Memorial Hospital for reanastomosis of the ileum. This corrective surgery was performed by Doctor Tenney on October 24, 1974. Plaintiff's stay in the hospital following this operation was prolonged because of infection, but she was finally discharged on November 10, 1974. She convalesced at home and returned to work in January 1975, without encountering further problems.

Plaintiff alleged defendant was negligent in the following two respects: "a. Lack of due care in his diagnosis of the Plaintiff's affliction, resulting in his incorrectly diagnosing the Plaintiff's true condition, which was either one or more of the following: acute or peri appendicitis, or regional illeitis (sic). b. Prematurely discharging Plaintiff from Lincoln General Hospital on or about the 17th day of August, 1974, when he knew or should have known she needed continued diagnosis, care and treatment, in that she was until early that morning experiencing nausea, vomiting, fever, elevated pulse rate, & abdominal pain."

Following plaintiff's first surgery, consultation was had with two gastroenterologists, Doctor Joseph Stitcher and Doctor David Dyke. The diagnosis of Doctor Stitcher on September 9, 1974, was as follows: "Acute pelvic inflammatory process, probably acute enteritis/possible Crohn's disease with subsequent small bowel fistula." Enteritis refers to inflammation of the small intestine. Crohn's disease is another name for regional ileitis. Biopsy reports and X-rays, however, did not reveal the presence of Crohn's disease. Doctor Stemper's diagnosis following plaintiff's October discharge was as follows: "1. Pelvic abscess. 2. Acute appendicitis. 3. Possible regional ileitis with fistula formation."

On October 22, 1974, just prior to plaintiff's second surgery, Doctor Dyke noted that plaintiff's "surgical

tissue has been personally reviewed and the rebiopsies of the ileum plus the small bowel study (X-ray) have not suggested Crohn's disease."

Plaintiff's expert witness, Doctor John Dunn, an Omaha family practitioner, testified from his review of the hospital records he concluded plaintiff had Crohn's disease. Plaintiff developed the complications of an abscess formation and a fistula formation as a result of regional ileitis. He did not think there was any difference between the standard of care for a practitioner in Lincoln as contrasted with Omaha. He testified the standard of care at the time of hospitalization "is to develop what's called differential diagnosis of the symptoms and the findings that are presented." From the symptoms the plaintiff was exhibiting, Doctor Dunn thought the differential diagnosis would include appendicitis, pelvic inflammatory disease, disease of the ovary, viral infection of the bowel, and urinary tract infection. He testified he had no fault with Doctor Moore having chosen PID as a working diagnosis. He further testified he had no objection to his mode of treatment for the first few days. He did feel, however, that Doctor Moore deviated from the standard of care after what he considered to be a reasonable length of time when the patient's condition did not improve as it should have if the working diagnosis had been correct.

Doctor Dunn testified as to the standard of care as follows: "The standard of care, first of all, requires a concept of what a general standard of medical care is. And I think the important thing is that the general standard of medical care requires that a physician treating a patient develop a mechanism or a procedure by which he develops a proper approach to the solution of a problem, whatever that problem might be. The way to approach a medical problem in terms of a recognized standard of medical care is to develop, first of all, the possibilities for the causes

of the problem, to develop the most likely possibility or the most workable possibility, and design a therapy for that particular problem, hoping to find a solution to the medical problem. And I think that part of the standard of medical care is to evaluate the approach at appropriate intervals to decide whether the approach decided on was the one that's working. And what essentially the standard of care is is to try and develop a method of procedure which solves a medical problem at hand and which allows for re-evaluation and development of a different approach if a particular medical problem seems to be stubborn or seems to be resistant to the therapy that's been chosen the first go-round."

Doctor Dunn further testified in his opinion there was a deviation from the standard of medical care at approximately the third or fourth day of the hospitalization. His testimony on this point was as follows: "I think that the deviation, to summarize, I think the deviation was the failure to re-evaluate what I think was a therapy that was not solving the problem that the patient presented with and that the deviation basically centered around a failure to re-evaluate and to go on to another possible therapy for the problem or to approach it from another angle and order appropriate tests to find out whether there were other possibilities."

He further testified: "The standard of care, the standard of medical care requires that the physician involved in the therapy of the patient re-evaluate the therapy and if the therapy is not effective to go on to other laboratory or x-ray tests or to other appropriate tests that might indicate why the patient, either why the patient isn't responding to therapy or whether the original working diagnosis was incorrect."

Doctor Dunn was then asked what the standard of care required at the time she responded as she did to the penicillin, ampicillin, chloromycetin therapy. He answered as follows: "I think the standard

of care would require that two or three courses of action be taken. One, a consultant be recalled to re-evaluate the patient. Two, x-ray tests, which in this case may have been helpful, could have been ordered. And, three, a re-evaluation of the blood work could have been done."

Doctor Dunn then testified as to the standard of care applicable to the discharge of a patient. It is as follows: "The standard of care basically is relative to the pre-hospital condition of the patient. The ideal is to achieve the same medical state or state of health at the time of discharge as at the time of admission to the hospital or prior to the time that the patient became ill. With some conditions there is no way to reachieve that state of health. And, so, the ultimate goal is to reach optimum recovery from whatever caused the hospitalization. The other parts of appropriate discharge are to establish a pattern for the patient to be seen in the office, to make sure that the patient is aware of the medications or the therapies required on discharge, and to appropriately inform the patient as to the problem that they had and treatment and the possible problems that might occur in the future."

Doctor Dunn then described plaintiff's condition immediately prior to the discharge. He felt the plaintiff should not have been discharged on the 17th because the nurses' notes on the 16th indicate she was crying, upset, and could not sleep. She vomited what is described as "greenish fluid." She complained of abdominal discomfort and received Demerol. She was also on Percodan, which is another pain medication. On the 17th, the day of discharge, her pulse continued at the rate of 120 to 130. She continued to receive Demerol. She had vomited as late as 4:30 that morning. She had been given Tigan for nausea. In his opinion she was still sick and her problem had not been solved.

In Doctor Dunn's opinion the deviation from the

standard of medical care was that she was discharged with a high pulse rate which is an indication of body stress. She was discharged shortly after she had had significant problems with vomiting and that even up to the day of discharge she was receiving very strong pain medication. All of these indicators to him demonstrated that her problem had not been solved.

Doctor Dunn was asked whether any complications resulted from defendant's deviations from the standard of care. He replied: "On the basis of the medical records that I have reviewed, including pathologic specimens and the reports from the pathologists, the operative reports, the consultants' reports, I feel that the patient developed complications and those complications were increased because of failure to, a failure to treat appropriately at an early stage."

Doctor Dunn testified that what he thought she had was regional ileitis because the complications that she developed and the findings at the surgery were consistent with complications of regional ileitis, those being an abscess formation and a fistula formation. "There are other things that can cause those complications, but those two are definitely associated with regional ileitis." During later questioning, Doctor Dunn stated that in his opinion earlier medical or surgical treatment would have avoided the ileostomy.

On cross-examination, Doctor Dunn acknowledged that tests had not revealed the presence of Crohn's disease and there was some question as to whether this was in fact the cause of plaintiff's problem. He further stated that Crohn's disease is difficult to diagnose and he could not fault defendant for failing to arrive at a diagnosis of Crohn's disease. He also recognized that a pelvic abscess is a common complication of pelvic inflammatory disease. He answered in the affirmative when asked whether "pel-

vic inflammatory disease can result in an abscess which will surround the appendix and bowel and will cause the type of problems Mrs. Anderson had.''

Doctor Dunn maintained, however, that regardless of whether plaintiff had Crohn's disease or PID, there was a deviation from the accepted standard of medical care. He testified: ''No. My opinion as to — as to a deviation from the standard of care is not based on the ultimate diagnosis. Because as far as I'm concerned, the ultimate diagnosis, even on the basis of what is available in the chart, is still not solidified. The only thing we can really say is that the biopsies that were done after the surgery showed no evidence of Crohn's disease. But what I'm basing my opinion on is the fact that the patient didn't get better.''

On further cross-examination as to whether or not his opinion in the case was based upon his judgment that the patient had Crohn's disease, his answer was as follows: ''What I'm saying is that I think the patient had Crohn's disease and that she had to have an operation because of it. And if that was the case, then her early treatment might have prevented the necessity for the ileostomy. But what I'm ultimately saying is that it's the deviation from the standard of care doesn't have anything to do with what ultimately the cause of all these problems was. It's the fact that in the last few days of the hospitalization the patient was still sick.''

In reviewing this case, the applicable rule is: ''A motion for a directed verdict or its equivalent must be treated as an admission of the truth of all material and relevant evidence submitted on behalf of the party against whom the motion is directed, and such party is entitled to have every controverted fact resolved in his favor and to have the benefit of every inference which can reasonably be deduced from the evidence.'' Kortus v. Jensen, 195 Neb. 261, 237 N. W. 2d 845 (1976).

In a malpractice action, the burden is on the plaintiff to prove the generally recognized medical standard involved; that there was a deviation from that standard by the defendant; and that such deviation was the proximate cause of the plaintiff's injury.

The first of plaintiff's two allegations of negligence alleges a lack of due care on the part of the defendant in his diagnosis of the plaintiff's affliction. As we said in Golonka v. Gatewood, 199 Neb. 216, 257 N. W. 2d 403 (1977): "Malpractice may consist in the lack of skill or care in diagnosis as well as in treatment." In that case we quoted the following from Cook v. Moats, 121 Neb. 769, 238 N. W. 529 (1931): " 'To make a skilful and careful diagnosis of the trouble from which the plaintiff is suffering is one of the fundamental duties of a physician, and if he fails in that regard as well as in the application of improper treatment, and damages result therefrom, he must answer therefor.' "

A patient is entitled to an ordinarily careful and thorough examination such as the circumstances, the condition of the plaintiff, and the physician's opportunities for examination will permit, and, while he does not insure the correctness of his diagnosis, a physician or surgeon is required to use reasonable skill and care in determining through diagnosis the condition of the patient and the nature of the ailment, and is liable for a failure, due to want of the requisite skill or care to diagnose correctly the nature of the ailment, with resulting injury or detriment to the plaintiff. In re Estate of Johnson, 145 Neb. 333, 16 N. W. 2d 504 (1944).

In Kortus v. Jensen, 195 Neb. 261, 237 N. W. 2d 845 (1976), we said: "In determining what constitutes reasonable and ordinary care, skill, and diligence on the part of a doctor in a particular community, the test is that which physicians or surgeons in the same neighborhood and in similar communities engaged in the same or similar lines of work would ordinarily

exercise for the benefit of their patients. * * * Under the foregoing rules, proof of medical negligence (malpractice) requires two basic evidentiary steps, followed by proof relating to proximate cause and damages: (1) Evidence of the generally accepted and recognized standard of care or skill of the medical community in the particular kind of care; and (2) a showing that the physician or surgeon in question negligently departed from that standard in his treatment of the plaintiff. The burden of establishing *both* these essential elements rests upon the plaintiff's introduction of expert medical testimony."

On the point under consideration, it is to be noted that plaintiff's evidence discloses every doctor who made a diagnosis before the surgery made substantially the same diagnosis as the defendant. After the surgery, Doctor Stitcher, one of plaintiff's gastroenterologists, made a diagnosis of acute PID, probable acute enteritis or inflammation of the small intestine, or possibly Crohn's disease with subsequent bowel fistula. However, his biopsy reports and X-rays did not reveal the presence of Crohn's disease.

Looking at the evidence most favorably to the plaintiff, plaintiff's expert ruled out acute appendicitis and periappendicitis during the period that plaintiff was under defendant's care. The question then arises as to whether a physician could be negligent in failing to use due care in diagnosing something the patient did not have at the time the patient was under the physician's care. A physician could not be negligent in failing to give tests for something the patient did not have while under his care. Considering the fact that plaintiff's expert found no fault on the part of the doctor on this point, there can be no liability for them. Assuming, however, that both of those symptomologies were present while the plaintiff was under the care of the defendant, plain-

tiff's expert did not delineate the medically recognized standard of diagnosis in either instance, nor did he set forth any deviation from the standard by the defendant. There would then be a lack of proof on the part of the plaintiff to submit those issues to the jury.

Considering regional ileitis, which is technically called Crohn's disease, plaintiff's expert asserts that the plaintiff had Crohn's disease. He admitted this is a difficult disease to diagnose and nowhere does he fault the defendant for failing to diagnose it. Actually, he was asked the following question: "Now, as I understand it, it's your opinion that it certainly is not a deviation from the standard of care to be unable to diagnose Crohn's disease, is it? A. That's right."

We have heretofore set out Doctor Dunn's concept of the general standard of medical care to develop a proper diagnosis. We note he said part of the standard of medical care is to evaluate the approach at "appropriate intervals," to decide whether the approach decided on was the one that's working, and what essentially the standard of care is to try and develop a method of procedure which "solves a medical problem at hand" and which allows for re-evaluation and development of a different approach if a particular medical problem seems to be stubborn or seems to be resistant to the therapy that's been chosen the first go-around.

Assuming this is the standard of care, where in the standard is "appropriate intervals" defined? There is no evidence in the record of another standard defining "appropriate intervals." This must be left to the judgment of the treating physician.

Plaintiff's expert supplied his own standard: "I think the deviation occurred in that after what I consider to be a reasonable length of time, the patient's condition did not improve as should have been the case if the working diagnosis had been correct * * *."

We emphasize "in that after what I consider to be a reasonable length of time." A medical expert witness cannot set up his own standard and bind a physician charged with malpractice with that standard. To permit this practice would put every physician at the mercy of any so-called expert willing to conjure up a standard to fit the case in which the expert is testifying.

We are not suggesting by this statement that the plaintiff's expert was intentionally doing so. We emphasize the point, however, to suggest that a medical standard cannot depend upon the idiosyncrasies of the expert, or the personal standard of the expert, which in and of itself may be a deviation from the generally accepted medical standard.

Plaintiff's failure to introduce in evidence a standard on "appropriate intervals" in and of itself defeats the negligence attributed to the defendant by plaintiff's expert. The testimony is undisputed that defendant called in a surgeon, Doctor Richard Toren, for surgical consultation the day after plaintiff was admitted to the hospital and Doctor Toren examined plaintiff and followed the case throughout plaintiff's stay at the hospital, continuing to consult with the defendant. We point this out to show that defendant was meeting the first criteria suggested by plaintiff's expert. Relative to X-ray tests, we emphasize his language "may have been helpful," and also "a re-evaluation of the blood work could have been done."

Plaintiff's expert testified these procedures should have been undertaken at, according to his own standard, "appropriate intervals." Nowhere in the record is there an opinion based upon reasonable medical certainty as to what these procedures would have shown had they been accomplished. Nor is there any opinion that such procedures would have confirmed the doctor's after-the-fact diagnosis at the time.

Besides proving a physician charged with malpractice deviated from a standard of care, a plaintiff must prove such deviation caused injury or damage to the plaintiff. In other words, there must be proximate causation. In this case, plaintiff's expert attributed plaintiff's injury to negligence in the lack of early treatment. There is a reasonable inference from the expert's testimony that if plaintiff had not been prematurely discharged from the hospital the iliostomy would have been avoided.

This brings us to plaintiff's other allegation of negligence: "(b) Prematurely discharging Plaintiff from Lincoln General Hospital on or about the 17th day of August, 1974, when he knew or should have known she needed continued diagnosis, care and treatment, in that she was until early that morning experiencing nausea, vomiting, fever, elevated pulse rate, & abdominal pain."

Plaintiff adduced evidence that at the time of her discharge from the hospital she was still on strong pain medication. She had a pulse rate between 120 and 130, which was an indication of body stress. She was discharged approximately 5 hours after experiencing severe abdominal pains and significant problems with vomiting. Dr. Dunn testified these were deviations from the standard of medical care required by the circumstances.

We are considering this evidence on the sustaining of a motion for a directed verdict. We are required to give the plaintiff the benefit of every inference which can reasonably be deduced from the evidence. On the record before us, we cannot say this did not present a jury question. On this issue the motion should have been overruled.

The judgment is reversed and the cause is remanded for a new trial.

REVERSED AND REMANDED.