DR. JOSE A. SAPORTA, AS CONSERVATOR AND GUARDIAN OF
VICTOR J. SAPORTA, AN INCAPACITATED PROTECTED PERSON,
APPELLANT, V. STATE OF NEBRASKA, APPELLEE.

368 N.W.2d 783

Filed June 7, 1985. No. 83-798.

William M. Lamson, Jr., and Patricia A. Zieg, for appellant.

Paul L. Douglas, Attorney General, and Martel J. Bundy, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

PER CURIAM.

Jose A. Saporta, conservator and guardian of Victor J. Saporta, an incapacitated protected person, appeals the dismissal of an action brought pursuant to the State Tort Claims Act, Neb. Rev. Stat. §§ 81-8,209 to 81-8,235 (Reissue 1981). We affirm.

Victor Saporta had attempted suicide in August 1980 and February 1981. Victor's illness had been diagnosed as schizophrenia, an illness "manifested primarily by disorganization of thought processes; changes of affect, which is the amount of facial expression; changes in a person's level of motivation; changes in a person's level of energy; changes in a person's ability to work and interact with other people." Victor was treated in a private hospital. Following release from private hospitalization in 1981, Victor threatened suicide by carbon monoxide from a running engine of an automobile in a closed garage. On May 27, 1981, Victor was admitted to the Norfolk Regional Center by order of the Douglas County Board of

Mental Health.

At the regional center, Victor stayed in ward 20 during the course of his treatment, which included participation in socialized activities and medication, the mainstay and an "absolute imperative" for the psychotic condition of Victor. Victor was a "nonresponder" to virtually every class of antipsychotic drug. Medication administered to Victor included Navane, Thorazine, Cogentin, and Benadryl. Navane, a potent antipsychotic medication, produces side effects such as cramps, spasms, and akathisia—restlessness and an inability to remain at rest. Thorazine offsets agitation, which a schizophrenic often encounters. Cogentin and Benadryl control the side effects of Navane. At the regional center Victor's physician felt previous dosages of Navane were an "undertreatment" by medication and increased Victor's daily dosage of Navane from the 20 milligrams daily administered in private hospitalization to 60 milligrams daily in the state hospital.

During the evening of July 20 and as the result of increased restlessness and agitation, Victor met with his "treatment team," which included a psychiatrist, a social worker, a registered nurse, and a licensed practical nurse. Progress notes from this meeting included: "The patient stated that he was experiencing quite a bit of anxiety, and that he was quite upset in general. We have seen him much more anxious and much more upset then [sic] this, but he did hint something about suicide, as he has done in the past." Upon inquiry by the treating team, whether Victor was threatening to harm himself, all members of the treating team concluded that Victor was not threatening suicide. After the July 20 meeting with the treatment team, Victor received an increased dosage of Benadryl and retired for the night. None of the treating team informed the night shift about the discussion with Victor.

During the early morning of July 21, Victor was restless and was given Thorazine. Victor fell asleep and awakened at 9 a.m., as observed by a hospital technician. That morning there was nothing out of the ordinary in Victor's behavior. In keeping with the hospital's procedure of minimal restriction on a patient's freedom, Victor was permitted to leave ward 20. As

described by one physician, permitting a patient as much freedom as possible demonstrated that the hospital was "not simply warehousing somebody and snowing them with medications and locking them on a back ward someplace." By the least restrictive confinement, a patient might remain involved with the world in the hope that a patient would leave the hospital for a productive life.

After leaving the ward on July 21, Victor went to the lobby of the regional center and from a pay telephone called his mother at 9:10 a.m. Victor told his mother he was never going to repeat a night such as that which had just passed and he was going to kill himself immediately by throwing himself beneath a car. Victor's conversation with his mother ended at 9:19 a.m. Immediately, at 9:20 a.m., Mrs. Saporta called Victor's social worker at the regional center and informed him that Victor, in a telephone call from a public telephone, had threatened suicide. This telephone call to the social worker concluded at 9:25 a.m. The social worker walked 20 to 25 feet to the office of the nurse in charge of ward 20. The social worker and the nurse decided no immediate action was necessary, although the social worker failed to tell the nurse that Victor had threatened suicide.

No one at the regional center was aware that, after concluding his telephone call to his mother, Victor walked out of the regional center, went down the quarter-mile drive from the regional center to a public highway, and, while walking along the shoulder of a highway, encountered vehicular traffic. Victor met one motorist who, shortly after seeing Victor, contacted a Norfolk police officer. The police officer, in his cruiser, set out to locate Victor. In the meantime, still walking along the road, Victor jumped from the side of the road into the path of a truck. The truck struck and seriously injured Victor. Police arrived 3 to 4 minutes after the accident.

The investigating officer radioed his dispatcher about the accident. There is a discrepancy regarding the exact time of the radio transmission, which is placed sometime between 9:40 and 9:43 a.m.

Suit was filed against the State and charged negligence: insufficient communication among the staff regarding Victor's threat of suicide on the night of July 20; failure to restrict Victor

to his ward on the morning of July 21; failure to conduct an immediate search on the morning of July 21, when Victor threatened suicide; and failure to properly treat Victor's symptoms, especially on the evening of July 20 and the morning of July 21.

The plaintiff presented evidence that Thorazine would exacerbate Victor's akathisia of July 20; that the dosage of Navane was "inordinate"; and that the side effects of Navane, notwithstanding administration of Cogentin and Benadryl, resulted in Victor's attempted suicide. Witnesses for the State testified that the regimen of medications for Victor was "normal procedure and a good standard of care."

There was evidence on behalf of the plaintiff that Victor was not receiving the appropriate socialization therapy, while one of the State's expert witnesses testified that Victor was provided with suitable therapy in that regard.

Concerning communication between shifts, a medical witness for the plaintiff testified that the morning shift should have been alerted to Victor's condition of agitation and restlessness and instructed to keep watch over Victor. A medical witness on behalf of the State, after reviewing Victor's history and the meeting with the treating team on July 20, expressed an opinion that Victor had not made a threat of suicide in the course of the meeting on the evening of July 20. According to the State's expert witnesses, since Victor had made no suicide threat at the July 20 meeting and the treating team had thoroughly questioned Victor about such possibility, there was no need for the treating team to inform the night shift or any succeeding shift of the discussion with Victor. At least two expert witnesses on behalf of the plaintiff conceded that Victor had not threatened suicide during the July 20 meeting with the treating team.

The plaintiff presented evidence concerning the types of searches which certain individuals associated with the hospital would have undertaken to locate Victor.

The ward nurse testified he would have instituted an immediate search for Victor by searching the hospital grounds and then looked for Victor on some of the highways adjacent to the hospital. The social worker testified that he would have

looked for Victor on the regional center's driveway leading to the public highways. The hospital's administrator testified the situation warranted a "code green," that is, every available male nurse at the hospital reacts to an emergency call. Within 3 to 5 minutes there would have been 15 to 20 employees available to search for Victor. Following assembly of personnel, a code green search would take from 5 to 10 minutes to expand from the hospital to the accident site where Victor was injured. The administrator conceded that a code green procedure had never been placed in operation at the hospital so that any time elements indicated by the administrator were somewhat speculative.

After reviewing the time elements of July 21 and the specific facts preceding the accident involving Victor, a psychiatrist, as an expert witness for the State, testified concerning a proper search procedure under the circumstances. This expert witness testified that, upon word of Victor's threatened suicide, the ward nurse should be contacted for an impression of Victor's mental state on the morning in question. In fact, this was done on the morning of Victor's disappearance. If there was a likelihood of harm to a missing patient, a systematic search would then be undertaken. First, the patient's ward would be checked. If such search disclosed that a patient was missing from his or her ward, all wards of the hospital were then checked. If a search of the wards was unproductive, the rest of the hospital building proper would be searched. With the hospital building as the center, the area of the searches would be expanded in an ever-increasing circle throughout the grounds and area adjacent to the hospital grounds. If a missing patient were not discovered after the foregoing procedure, law enforcement authorities were contacted. Notwithstanding Victor's threat to throw himself beneath a vehicle, the expert testified that statements by a patient describing a method of threatened suicide should not govern the nature of the search; rather, a systematic search should commence in the hospital building and on the hospital grounds before expanding into a search of the area outside the hospital grounds. As expressed by that expert: "You have to make [the search] fairly systematic and gradually expand the search to the outside and then hope

you find [the patient] outside if you cannot find him inside the premises."

The district court made the following findings: (1) The plaintiff had failed to prove negligence in Victor's care and treatment on July 20 and 21. (2) Victor terminated the telephone call with his mother at 9:19 a.m. and immediately left the hospital grounds; Mrs. Saporta's telephone call to Victor's social worker terminated at 9:25 a.m.; the social worker contacted the ward nurse, with no subsequent search for Victor, so that there was negligence in failing to undertake an immediate search; but if there had been an immediate search of the wards, buildings, and grounds, such search would have been unsuccessful because Victor had already departed from the regional center. The court concluded that any negligence of hospital personnel was not a proximate cause of Victor's injury.

The State Tort Claims Act requires that actions of this nature be heard without a jury, but otherwise determined in the same manner as other suits. The action is similar to a law action in which a jury has been waived and is governed by the same rules. See, §§ 81-8,214 to 81-8,216; *Brown v. State*, 205 Neb. 332, 287 N.W.2d 676 (1980).

The action commenced by Victor's conservator-guardian is based upon professional negligence (malpractice) in the actions of the physicians and staff at the Norfolk Regional Center. As expressed in *Anderson v. Moore*, 202 Neb. 452, 464-65, 275 N.W.2d 842, 849 (1979):

In a malpractice action, the burden is on the plaintiff to prove the generally recognized medical standard involved; that there was a deviation from that standard by the defendant; and that such deviation was the proximate cause of the plaintiff's injury.

. . . .

In Kortus v. Jensen, 195 Neb. 261, 237 N.W.2d 845 (1976), we said: "In determining what constitutes reasonable and ordinary care, skill, and diligence on the part of a doctor in a particular community, the test is that which physicians or surgeons in the same neighborhood and in similar communities engaged in the same or similar lines of work would ordinarily exercise for the benefit of

their patients. \* \* \* Under the foregoing rules, proof of medical negligence (malpractice) requires two basic evidentiary steps, followed by proof relating to proximate cause and damages: (1) Evidence of the generally accepted and recognized standard of care or skill of the medical community in the particular kind of care; and (2) a showing that the physician or surgeon in question negligently departed from that standard in his treatment of the plaintiff. The burden of establishing *both* these essential elements rests upon the plaintiff's introduction of expert medical testimony."

The *Anderson* court also went on to state that

[a] medical expert witness cannot set up his own standard and bind a physician charged with malpractice with that standard. To permit this practice would put every physician at the mercy of any so-called expert willing to conjure up a standard to fit the case in which the expert is testifying.

*Anderson v. Moore, supra* at 467, 275 N.W.2d at 850.

Concerning the regimen of medications and therapy prescribed for Victor, there is conflicting evidence concerning the appropriate care and treatment for Victor. Likewise, there was conflicting testimony regarding action which should have been taken regarding intershift communication about Victor's meeting with the treatment team on July 20. All situations regarding care, treatment, and communication presented issues of fact to be disposed by the district court as the trier of fact. Upon a review of the record we cannot state that the conclusions reached by the district court in the foregoing areas are clearly wrong.

The focal point of the appeal is the issue of proximate cause concerning Victor's injuries. The district court, as trier of fact, determines the questions of proximate cause. See *Brown v. State, supra*.

In *Daniels v. Andersen*, 195 Neb. 95, 101-02, 237 N.W.2d 397, 402 (1975), we observed:

Once the defendant's negligence has been established, it is necessary to find that the plaintiff's injuries were proximately caused by the defendant's negligence. . . .

There are three basic requirements in establishing proximate cause. The first requirement is that the negligence be such that "without which the injury would not have occurred," commonly known as the "but for" rule. . . .

The second requirement is that the injury be the natural and probable result of the negligence. . . .

. . . .

The third requirement is that there be no efficient intervening cause.

In view of the findings of the trial court in this case, the district court determined that the search procedure outlined and described by the State's expert witnesses was a proper search procedure under the circumstances and, had such search procedure been undertaken, in view of the time element the search procedure would not have located Victor in time to prevent the accident. Expressed differently, the district court concluded that, had a search been undertaken, the time consumed in an appropriate search locating Victor exceeded the time which would have elapsed between commencement of such search and occurrence of the accident injuring Victor on July 21. As one notable authority states: "The defendant's conduct is a cause of the event if the event would not have occurred but for that conduct; conversely, the defendant's conduct is not a cause of the event, if the event would have occurred without it." Prosser and Keeton on the Law of Torts, *Proximate Cause* § 41 at 266 (5th ed. 1984).

Under the evidence presented and the trial court's resolution of conflicting testimony and opinions, we cannot state that the trial court's finding and disposition are clearly wrong.

AFFIRMED.